1  Anna Hsia (SBN 234179)
   ZWILLGEN LAW, LLP
2  369 Pine Street, Suite 506
   San Francisco, CA 94104
3  Telephone: (415) 590-2341
   Facsimile: (415) 636-5965
4  anna@zwillgen.com
5
   Attorney for Defendant
6  **HEALTHLINE MEDIA, INC.**

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12  SHEILA HUGHLEY, and ROBIN           Case No.  4:22-cv-05059-JD
    JEFFERSON, individually and on behalf of all
13  others similarly situated,          **DEFENDANT HEALTHLINE MEDIA,**
                                        **INC.'S NOTICE OF MOTION AND**
14              Plaintiffs,             **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES TO DISMISS THE**
15      v.                              **COMPLAINT**

16  HEALTHLINE MEDIA, INC.              Judge:       Hon. James Donato
                                        Hearing Date: January 12, 2023
17              Defendant.              Time:        10:00 a.m.
                                        Courtroom:   11, 19th Floor
18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**TO THE COURT AND ALL PARTIES OF RECORD:**

    **PLEASE TAKE NOTICE THAT** on January 12, 2023, or as soon thereafter as this matter may be heard, before the Honorable James Donato in Courtroom 11 of this Court, located on the 19th Floor of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Healthline Media, Inc. ("Defendant" or "Healthline") will, and hereby does, move the Court for an order granting its Motion to Dismiss the Complaint. This Motion is made based on Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs' allegations fail to state any valid claim. This Motion will be based upon this Notice; the accompanying Memorandum of Points and Authorities; the Declaration of Stacy Swinton; the complete record in this action; and such other matters and arguments as may come before the Court, including those raised in connection with reply briefing and oral argument relating to this Motion.

Dated: November 21, 2022            **ZWILLGEN LAW LLP**

                        By:  /s/ Anna Hsia
                             Anna Hsia SBN 234179
                             Anna@zwillgen.com

                             **Attorney for Defendant**
                             Healthline Media, Inc.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 2

    A.    Healthline and Healthline.com ............................................................... 2

    B.    The Named Plaintiffs ............................................................................... 3

III.   LEGAL STANDARD .......................................................................................... 4

IV.   ARGUMENT ....................................................................................................... 4

    A.    The Complaint Does Not Allege A Viable Claim Under the VPPA ...................... 4

        1.    Healthline is not a Video Table Service Provider. ................................... 4

            a.   The VPPA only concerns audiovisual content "similar to" prerecorded

                video cassette tapes. ........................................................................ 4

            b.  Healthline is not "engages in the business" of delivering videos. ................... 6

        2.    Plaintiffs are not "consumers" under the VPPA because they did not

            rent, purchase, or subscribe to any video or video-related service

            from Healthline. .................................................................................... 7

        3.    The Complaint does not plausibly allege that Healthline disclosed

            PII to Meta. ......................................................................................... 10

        4.    Even it if does allege a disclosure, the Complaint does not plead a

            "knowing" disclosure. ......................................................................... 12

    B.    The Complaint Does Not – And Cannot—Allege a UCL Claim ........................ 13

        1.    The Plaintiffs lack standing to pursue a UCL claim. ............................ 13

        2.    The Plaintiffs allege no facts showing that the UCL applies to them. ................. 14

        3.    The allegations do not support a UCL claim. ....................................... 14

    C.  The Complaint Does Not—And Cannot—Allege an Unjust Enrichment Claim. ....... 15

V.    CONCLUSION ................................................................................................. 15

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# **TABLE OF ATHORITIES**

Page(s)

<u>Cases</u>

*Abuelhawa v. Santa Clara Univ.*,
529 F. Supp. 3d 1059 (N.D. Cal. 2021) ...................................................................... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................... 4

*Austin-Spearman v. AMC Network Entertainment LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ....................................................................... 8-10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 54 (2007) ......................................................................................................... 4

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ...................................................................... 15

*Costanzo v. City of Omaha*,
2004 WL 2359722 (D. Neb. Oct. 19, 2004) ............................................................... 7

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) .................................................................................... 15

*Ehret v. Uber Techs., Inc.*,
68 F. Supp. 3d 1121 (N.D. Cal. 2014) ...................................................................... 14

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ........................................................................................ 7

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......................................................................... 8, 9, 10

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) .................................................................................................. 5

*First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*,
437 U.S. 255 (1978) ....................................................................................................... 5

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
61 Cal. 4th 988 (2015) ................................................................................................. 15

*In re Facebook Priv. Litig.*,
572 Fed. Appx. 494 (9th Cir. 2014) ........................................................................... 13

ii

United States District Court
Northern District of California

*In re Google Android Consumer Priv. Litig.*,
2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) ............................................................. 14

*In re Google Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015) ....................................................................................... 12

*In re Hulu Privacy Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ............................................................. 11

*In re Hulu Privacy Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................................... 10, 12

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ...................................................................................... 6, 7

*In re Vizio, Inc., Consumer Privacy Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ........................................................................ 6

*Janda v. T-Mobile, USA, Inc.*,
2009 WL 667206 (N.D. Cal. Mar. 13, 2009) .............................................................. 15

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) .................................................................................... 11

*Kwikset Corp. v. Superior Court*,
246 P.3d 877 (2011) ................................................................................................... 13

*Lebakken v. WebMD, LLC*,
2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) .......................................................... 9, 10

*Low v. Linkedin Corp.*,
2011 WL 5509848 (N.D. Cal. Nov.11, 2011) ..........................................................13-14

*MCI Telecomm. Corp. v. AT&T Co.*,
512 U.S. 218 (1994) ..................................................................................................... 5

*McMillan v. Amazon.com, Inc.*,
983 F.3d 194 (5th Cir. 2020) ....................................................................................6-7

*Mollett v. Netflix, Inc.*,
2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) ............................................................ 12

*Perry v. Cable News Network, Inc.*,
854 F.3d 1336 (11th Cir. 2017) ................................................................................ 8, 9

*Stark v. Patreon, Inc.*,
2022 WL 7652166 (N.D. Cal. Oct. 13, 2022) ................................................... 6, 13, 15

*Sullivan v. Oracle Corp.*,
254 P.3d 237 (2011) ...................................................................................................... 14

*United States. v. Stanko*,
491 F.3d 408 (8th Cir. 2007) ........................................................................................... 5

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) ....................................................................................... 13

*Warner v. Tinder Inc.*
105 F. Supp. 3d 1083 (C.D. Cal. 2015) .......................................................................... 14

*Warren v. Fox Fam. Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) ......................................................................................... 4

*Yershov v. Gannett Satellite Information Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ................................................................................. 8, 9, 10

Statutes and Rules

18 U.S.C. § 2710(a)(1) ..................................................................................................... 7

18 U.S.C. § 2710(a)(3) ................................................................................................... 10

18 U.S.C. § 2710(a)(4) ............................................................................................... 1, 4-5

18 U.S.C. § 2710(b)(1) ................................................................................................... 12

18 U.S.C § 2710(c)(3) ...................................................................................................... 4

Fed. R. Civ. P. 8(a)(2) ...................................................................................................... 4

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 4

Legislative Materials

S. Rep. No. 100-599 (1988) ......................................................................................... 7-8

Other Authorities

*Similar*, Black's Law Dictionary (6th ed. 1990) ............................................................. 5

United States District Court
Northern District of California

1

## I.      INTRODUCTION

2            The theory underlying this proposed class action lawsuit is that if a website (i) includes

3  video and (ii) keeps track of basic website analytics using the Meta Pixel, there is a violation of

4  the federal Video Privacy Protection Act ("VPPA"). Defendant Healthline Media, Inc.'s website

5  includes video and uses the Meta Pixel. Therefore, Plaintiffs Shelia Hughley and Robin

6  Jefferson—two individuals that signed up to receive emails from Healthline—say that they and a

7  national class of healthline.com visitors are entitled to a $2,500 statutory damages award "per

8  violation" of the VPPA for a period spanning nearly 10 years.

9            That is a hefty serving of liability. But while Plaintiffs estimate their theory would cover

10 more than 30% of all websites, the VPPA is not a tool for taking down the internet. Rather, it is a

11 focused statute with a specific reach. By its terms, the VPPA applies only to "video tape service

12 providers" ("VTSPs")—entities "engaged in the business" of "rental, sale, or delivery of

13 prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). And

14 even then, it only prevents unauthorized parties from prying into the video rental history of those

15 customers. But when Congress enacted the VPPA in 1988, it did not include within the scope of

16 the statute information about the consumption of other types of informational offerings, like

17 books, magazines, records, newspapers, radio programming, or television. Congress was certainly

18 aware of these forms of content and excluded all of them from the VPPA's scope. Congress was

19 also aware of such material when it amended the VPPA in 2013 and did not expand the statute's

20 coverage. Thus, while courts have interpreted the VPPA to cover movies viewed at home

21 regardless of whether they were physically taken from a Blockbuster video or streamed online

22 using Netflix, there is nothing in the statute suggesting that it applies to any and all video content.

23           But that is what Plaintiffs allege here and that is a leading reason why their lawsuit should

24 not move forward. Beyond this fundamental misapplication of the VPPA, there are a multitude of

25 reasons why their claim under the VPPA has no hope of survival.

26           **First**, Healthline is not a VPPA defendant. The Complaint does not allege that Healthline

27 delivers video content "similar to" prerecorded video tapes, and does not allege that the delivery,

28 rental, or sale of such content is a focus of its business.

United States District Court
Northern District of California

**Second**, the Plaintiffs are not VPPA plaintiffs. Each of the Plaintiffs allege that they watch unspecified videos on healthline.com—but they do not allege that they purchased, rented, or subscribed to any of Healthline's video content. Because they don't meet the basic definition of a "consumer" under the VPPA, the Act does not apply to them.

**Third**, the Plaintiffs' allegation of purportedly unlawful disclosures depends entirely on Healthline's alleged transmission of their Facebook Profile IDs in connection with a record of the videos they consumed on the Healthline website. But the Complaint pleads no actual factual content suggesting that happened; Healthline has no way of accessing the Plaintiff's Facebook Profile IDs in the first instance and, thus, Healthline had no way of disclosing them.

**Fourth**, the Plaintiffs do not allege any *facts* supporting Healthline's knowing transmission of their personal video viewing records to Meta. Instead, they just sprinkle the word "knowing" across the pleadings, which does nothing more than echo the statute's requirements.

The Plaintiffs' two claims under California law fare no better. The Unfair Competition Law (the "UCL") claim fails on standing grounds (because Plaintiffs do not allege they suffered any economic harm), on the merits (because Healthline's data sharing practices are disclosed), and for seeking extraterritorial application of the statute (because they are out-of-state residents). And Plaintiffs cannot bring a standalone claim for unjust enrichment, so that claim fails too.

The VPPA is a statute that ensures all Americans can enjoy privacy in the entertainment choices they make in their own homes. But it was, and is, a limited statute that does not apply just because a website includes video. The Complaint should be dismissed.

## II.   BACKGROUND

### A.   Healthline and Healthline.com

Healthline Media, Inc. is a Delaware corporation, with its principal place of business in San Francisco. Compl. (Dkt. 1) at ¶ 28. Healthline's website, healthline.com, provides information to visitors about physical and mental health. *Id.* ¶ 35. The website includes, among other topics, individual pages about health conditions, resources about wellness topics, and provides links to communities and products related to the various subjects discussed on the site. Some pages of Healthline's website use video content. *Id.* ¶ 36. The Complaint does not allege that users must

2

register with Healthline to view video content (because they do not).

The Complaint alleges that the Healthline website incorporates the "Meta Pixel," which it says is used by over 30% of all websites. *Id.* ¶¶ 44, 46. Once installed, a website can allegedly track information about how its users interact with the site, such as which pages are visited and when buttons are clicked. *Id.* ¶ 43. Plaintiffs allege that Healthline configured its Meta Pixel to track "which videos a user requested and viewed on Healthline." *Id.* Plaintiffs allege that Healthline sends this data to Meta. *Id.* ¶ 49.

The Complaint also discusses "Facebook Profile IDs." Plaintiffs allege that any person can use the data to "identify any individual on [the] Facebook platform." *Id.* ¶ 40. While Plaintiffs presume that Healthline knows its website visitors' Facebook Profile IDs, *see, e.g., id.* ¶¶ 5-6, the Complaint pleads no facts alleging how Healthline accesses or comes into possession of the data. It does, however, implicitly acknowledge that Facebook Profile IDs are stored on a cookie placed by Facebook on Facebook users' browsers under certain conditions (e.g., when they use a browser to log into Facebook and do not log out, which is what the Plaintiffs allege they did here, *see* Compl. ¶¶ 15, 24), but does not allege that Healthline is able to access that data.

For their VPPA claim and their derivative claims brought under California law, Plaintiffs allege that Healthline combines the analytic data relating to videos on its website with Facebook Profile IDs and, "in the same transmission," sends the data to Meta. *Id.* ¶ 50. The Complaint does not explain how Healthline sends data to Facebook that Healthline does not have and cannot access. The Complaint alleges this information is thereafter "linked," but similarly does not explain how or when that linking occurs, or how Healthline came to know that it occurs. *Id.*

**B.    The Named Plaintiffs**

The two plaintiffs here—Sheila Hughley and Robin Jefferson—bring nearly identical allegations. Each alleges that she spends many hours every day on Facebook. *Id.* ¶¶ 12-13, 21-22. Each also alleges she subscribed to "Healthline's email list." *Id.* ¶¶ 11, 20. Each Plaintiff alleges that she logged into Facebook using her web browser and, while remaining logged into Facebook, visited healthline.com to watch videos. *Id.* ¶¶ 14-15, 23-24. Each Plaintiff then alleges that Healthline disclosed her Facebook Profile ID and the titles of viewed videos to Meta. *Id.* ¶¶ 16, 25.

United States District Court
Northern District of California

1    For their VPPA claim, the Plaintiffs seek relief for themselves and a national class of

2    visitors to the Healthline website. *Id.* ¶ 57. They seek $2,500 in statutory damages "per violation"

3    for a period stretching back to 2013, notwithstanding that the statute of limitations under the

4    VPPA is only two years. *Id.* ¶¶ 58, 80; 18 U.S.C § 2710(c)(3).

5    ## III.   LEGAL STANDARD

6    To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

7    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

8    662, 678 (2009). The rule that a court accept as true allegations in a complaint is "inapplicable to

9    legal conclusions," *id.*, and "[f]actual allegations must be enough to raise a right to relief above the

10   speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Warren v. Fox*

11   *Fam. Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003) (citation omitted) ("We do not ...

12   necessarily assume the truth of legal conclusions merely because they are cast in the form of

13   factual allegations."). Nor should a court "accept as true conclusory allegations which are

14   contradicted by documents referred to in the complaint. *Id.* Dismissal is warranted where the

15   "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."

16   *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

17   ## IV.   ARGUMENT

18   ### A.   The Complaint Does Not Allege a Viable Claim Under the VPPA

19   #### 1.   Healthline is not a Video Tape Service Provider.

20   Plaintiffs' claim fails because the VPPA is about movies and similar materials viewed in

21   the privacy of one's home; it does not apply to a website just because it includes videos. The

22   VPPA limits disclosures by a VTSP, which is a person "engaged in the business . . . of rental, sale,

23   or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. §

24   2710(a)(4). For the VPPA to apply, then, the materials at issue must be prerecorded video cassette

25   tapes or similar audio visual materials *and* the entity at issue must be engaged in the business of

26   delivering such video content. Neither is plausibly alleged here.

27      a.   The VPPA only concerns audiovisual content "similar to"
    prerecorded video cassette tapes.

28

---

4

1         Healthline is not a VTSP simply because there is "audiovisual content" on its website. The

2   VPPA does not apply to *all* or *any* audiovisual content; rather, it only applies to content "similar

3   to" the "prerecorded video cassette tapes" that Judge Bork rented from his local video store. 18

4   U.S.C. § 2710(a)(4). "Similar" means "[n]early corresponding; resembling in many respects;

5   somewhat like; having a general likeness." *Similar*, Black's Law Dictionary (6th ed. 1990).[1]

6         At the time of the VPPA's enactment, there were a multitude of "audiovisual" materials

7   available to consumers. Had Congress wanted the VPPA to apply to *any* video it could have done

8   so. But by restricting the statute to cover entities that provide content "similar" to pre-recorded

9   video tapes, it set a narrower scope. In *Stanko*, the court observed that where "Congress used the

10  comparative term 'similar' to modify 'offenses,' rather than saying 'any other offenses' or simply

11  'other offenses'"; it indicated "an intent to limit the business practices clause's reach to offenses

12  which are 'comparable' or 'nearly corresponding' to the enumerated offenses." *United States v.*

13  *Stanko*, 491 F.3d 408, 414 (8th Cir. 2007). So too with the VPPA. Congress could have defined a

14  VTSP as someone in the business of delivering prerecorded video cassette tapes or "any other

15  audio-visual materials" or simply "other audio-visual materials." It also could have defined a

16  VTSP as someone in the business of delivering "audio visual materials, including prerecorded

17  video cassette tapes." It did not, because it did not intend the VPPA to apply to all audio-visual

18  materials, only those like the videos rented by Judge Bork. *See Epic Sys. Corp. v. Lewis*, 138 S.

19  Ct. 1612, 1625 (2018) ("[W]here, as here, a more general term follows more specific terms in a

20  list, the general term is usually understood to 'embrace only objects similar in nature to those

21  objects enumerated by the preceding specific words.'") (citation omitted); *First Fed. Sav. & Loan*

22  *Ass'n of Bos. v. State Tax Comm'n*, 437 U.S. 255, 262 (1978) ("When Congress required that

23  federal savings and loan associations be placed in the same classification as 'similar' state

24  institutions, it certainly did not assume that every local and mutual or cooperative thrift and home-

25  financing institution is similar to a federal association."). Thus, to state a claim, a plaintiff must

26  make *some* showing that the defendant's provision of video content comes within the VPPA's

27

28  [1]       The "most relevant time for determining a statutory term's meaning" is the time when the law was enacted. *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994).

narrowed scope. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) ("We do not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage.")

The minimal allegations provided in the Complaint do not clear this bar. The Complaint only alleges that "Healthline provides prerecorded audiovisual content on its website;" thus, Plaintiffs do not allege any facts showing that video content on Healthline's website is "similar to" prerecorded video tapes. Compl. ¶ 36. Instead, they parrot the statutory language. *Id.* ¶ 72. But these are just conclusions and not sufficient to maintain a lawsuit. *Warren*, 328 F.3d at 1139. Dismissal is warranted. *Stark v. Patreon, Inc.*, 2022 WL 7652166, at *6 (N.D. Cal. Oct. 13, 2022) (dismissing claim where plaintiffs did "not sufficiently allege[] that [the defendant] provided 'similar audio visual materials,'" as required by the Act).

          b.     Healthline is not "engaged in the business" of delivering videos.

Healthline is also not a VTSP because it is not "engaged in the business" of providing video content as required by the VPPA. "[T]he defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). It must be the "focus of the defendant's work." *Id.* Thus, allegations that a business is "peripherally or passively involved in video content delivery do not [bring that business within] within the statutory definition of a [VTSP]." *Id.* at 1221–22.

Here, the Complaint makes no effort to show that any video content incidentally present on Healthline's website transforms the company into the equivalent of an online video rental store. The Complaint alleges that Healthline's website provides informational videos. Compl. ¶ 35. But it alleges nothing to suggest that its users come to Healthline to rent, buy, or subscribe to videos. In short, its business is not "significantly tailored" to providing video content. *See McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 199 (5th Cir. 2020), *certified question answered*, 625 S.W.3d 101 (Tex. 2021) (citation omitted) (construing "engaged in the business" and observing, "When the client walks out of the salon, she has shorter hair, but she also has a head full of hair product. . . . Still, a hairdresser is in the business of selling haircuts, not selling handfuls of mousse. One

does not go to the hair salon to acquire a dollop of moisturizing serum and a few spritzes of hairspray."). Indeed, Plaintiffs' theory would mean that nearly every health-related service with a website that includes video content (e.g., the "What to expect on your visit" informational videos we've all watched) would also be covered under the Act. But that impossibly broad scope is not supported by the VPPA's reach. *See In re Nickelodeon*, 827 F.3d. at 288 (the VPPA "serves different purposes, and protects different constituencies, than other, broader privacy laws"); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage.").

Because Plaintiffs don't allege that Healthline provides materials "similar to" pre-recorded video tapes or focuses its business on providing such content to consumers, the claim fails.

### 2. Plaintiffs are not "consumers" under the VPPA because they did not rent, purchase, or subscribe to any video or video-related service from Healthline.

Even if Healthline were a VTSP in some capacity (it most certainly is not), Plaintiffs do not allege facts that would qualify them as "consumers" under the VPPA. Under the Act, a consumer is a "renter, purchaser, or subscriber of goods or services from a [VTSP]." 18 U.S.C. § 2710(a)(1). Here, because Plaintiffs do not allege they purchased or rented anything from Healthline, they must allege they are "subscribers." They fail to do so.

The term subscriber is not defined, but courts have construed it in a consistent way. All agree that a VPPA subscription does not require payments. But for the VPPA to apply, courts look for a connection between a would-be subscriber and the defendant's provision of video content. This is hardly surprising. The VPPA was passed following the leak of Judge Bork's videotape rental history from a brick-and-mortar video store, S. REP. 100-599 at *5 (1988), and was enacted to address that specific conduct. *See Costanzo v. City of Omaha*, 2004 WL 2359722, at *2 (D. Neb. Oct. 19, 2004) ("This statute applies to private video stores and is designed to prohibit dissemination of information by the store owners about the consumers."). But neither the text nor the intent of the VPPA covers a business's—even ones that *are* engaged in the videotape rental business—provision of materials or services unrelated to video delivery. *See* S. REP. 100-599 at

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

United States District Court
Northern District of California

1  *11-12 ("[S]imply because a business is engaged in the sale or rental of video materials or services

2  does not mean that all of its products or services are within the scope of the bill.").

3       This circumscribed reach is reflected in opinions discussing whether a given plaintiff is a

4  "subscriber" under the VPPA. The Eleventh Circuit has twice examined whether a consumer's use

5  of a free app made her a subscriber under the VPPA. In each case, the court looked to whether the

6  plaintiff's use of the app to watch videos involved "some type of commitment, relationship, or

7  association (financial or otherwise) between a person and an entity." *Ellis v. Cartoon Network,*

8  *Inc.*, 803 F.3d 1251, 1256-1258 (11th Cir. 2015); *see also Perry v. Cable News Network, Inc.*, 854

9  F.3d 1336, 1341 (11th Cir. 2017). In *Ellis*, the court specifically focused on the difference between

10  having access to video content and subscribing to it; the latter described a "subscriber"

11  relationship under the VPPA, but the former did not. 803 F.3d at 1257 ("[A non-subscriber] is free

12  to delete the app without consequences whenever he likes, and never access its *content* again.")

13  (emphasis added). And in *Perry*, the court agreed that the plaintiff's ability to access exclusive

14  video content on the CNN app because of his cable television subscription "show[ed] a

15  commitment to . . . his cable television provider"—i.e., the entity that provided access to the

16  subscribed-to video content—but not the app provider, with whom the plaintiff was not required to

17  "engage [with] in any other way in order to gain access to [the video content]." 854 F.3d at 1342-

18  43.

19       The First Circuit reached a different outcome on the subscriber issue in *Yershov v. Gannett*

20  *Satellite Information Network, Inc.*, but still anchored its test to a connection to the defendant's

21  delivery of video material. 820 F.3d 482, 489 (1st Cir. 2016). There, the plaintiff alleged that he

22  provided the defendant with information in exchange for streaming video content. In the First

23  Circuit's view, that consideration was enough to establish a subscriber relationship under the

24  VPPA. *Id.* The opinion reiterated the point by considering a "non-electronic version" of the same

25  relationship: a hypothetical telephone hotline to *request videos* on demand would also count as a

26  VPPA "subscription." *Id.* In both actual and hypothetical case, what counted was a connection

27  between the plaintiff, on the one hand, and the defendant's delivery of *video content*, on the other.

28       In line with these tests, the decision in *Austin-Spearman v. AMC Network Entertainment*

8

---

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO
DISMISS; CASE NO. 22-cv-05059-JD

1    *LLC*, 98 F. Supp. 3d 662 (S.D.N.Y. 2015) demonstrates the limits of the VPPA's reach. In that

2    case, the plaintiff alleged that she watched video clips from the *Walking Dead* TV show on

3    AMC's website but did not allege any other commitment to the website's provision of video

4    content. *Id.* at 664, 669. The court held that this "casual consumption of web content, without any

5    attempt to affiliate with or connect to the provider . . . [did] not suffice to render Austin–Spearman

6    a 'subscriber' of AMC." *Id.* at 669. The plaintiff requested leave to amend so she could allege that

7    she subscribed to an AMC newsletter about the *Walking Dead*. *Id.* at 671. While the proposed

8    amendment would undoubtedly have evidenced a relationship between the plaintiff and AMC, the

9    court explained that was almost certainly not enough to allege a subscriber relationship under the

10   VPPA because the "newsletter" was "distinct and set apart from [AMC's] provision of videos[.]"

11   *Id.* The *Ellis* court signaled its agreement with this approach. 803 F.3d at 1257-58.

12        Here, the Plaintiffs only allege that each "visited the Healthline website using her web

13   browser . . . to view video content." Compl. ¶¶ 14, 23. That barebones allegation puts the Plaintiffs

14   in a worse position than the plaintiffs in *Ellis*, *Perry*, and *Yershov*, all of whom at least

15   downloaded the defendant's app and might have felt compelled to watch videos on it. But here,

16   nothing distinguishes Plaintiffs from any visitor to the website that watched video content. They

17   do not allege that they created accounts on Healthline's website or subscribed to services that

18   provided them with access to video content. *See Lebakken v. WebMD, LLC*, 2022 WL 16716151,

19   at *2-3 (N.D. Ga. Nov. 4, 2022) (plaintiff was a "subscriber" to WebMD's provision of video

20   content under the VPPA where she "created her own WebMD account" and subscribed to a video

21   newsletter). Without any connection alleged between the Plaintiffs and the videos on Healthline's

22   website, there is no basis to find that the Plaintiffs were VPPA "subscribers" simply because they

23   viewed videos on the website. *Ellis*, 803 F.3d at 1257 ("The downloading of an app, we think, is

24   the equivalent of adding a particular website to one's Internet browser as a favorite, allowing

25   quicker access to the website's content . . . [which did not make the plaintiff] a 'subscriber[.]'").

26        Plaintiffs attempt to shoehorn in the required relationship through an allegation that they

27   "subscribed to Healthline's email list." Compl. ¶¶ 11, 20. But this is no better than the proposed

28   amendments in *Austin-Spearman*, which, at least, concerned a television show. Here, the Plaintiffs

9

do not allege that they agreed to receive emails in exchange for access to video content, similar to the plaintiff's agreement in *Yershov*, 820 F.3d at 489, or were provided video content through the emails they subscribed to (and also subscribed to the website where video was provided), as was the case in *Lebakken*, 2022 WL 16716151, at *3.[2] The alleged "email list" subscriptions have no bearing on any purported claim under the VPPA. *Austin-Spearman*, 98 F. Supp. 3d at 671.

### 3.   The Complaint does not plausibly allege that Healthline disclosed PII to Meta.

The Plaintiffs' VPPA claim additionally fails because they do not plausibly allege that Healthline disclosed personally identifiable information ("PII") to Meta.

The VPPA limits only the disclosure of PII. As defined in the statute, PII "includes information which identifies a person as having requested or obtained specific video materials or services from a [VTSP]." 18 U.S.C. § 2710(a)(3). An actionable VPPA claim thus requires "three distinct elements . . . the consumer's identity; the video material's identity; and the connection between them." *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (recognizing that "[t]he point of the VPPA, after all, is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos").

Plaintiffs' Complaint is devoid of any factual content showing disclosure of any information by Healthline. Most glaring, however, is their failure to plead any facts showing Healthline disclosed their identities. The foundation of Plaintiffs' VPPA claim is the repeated allegation that, in addition to information identifying the "full name" of videos watched on the website, Healthline disclosed Plaintiffs' Facebook Profile IDs. *See* Compl. ¶¶ 5, 6, 16, 25, 38, 42, 50, 51. Missing, however, is an explanation of how *Healthline* could have known the Facebook Profile IDs of the Plaintiffs such that it even could disclose that information to Meta at all. *Id.* ¶ 42. The Plaintiffs do not, for example, allege that they created accounts on the Healthline website

---

[2]     To the extent the *Lebakken* court relied on *Ellis* for the simpler point that a subscription to a newsletter is sufficient to allege a VPPA subscription, it was mistaken. *See Lebakken*, 2022 WL 16716151, at *2 (citing *Ellis*, 803 F.3d at 1256). The Eleventh Circuit's reference to "newsletters" in *Ellis* was only to support the point that payment is not a necessary component to many different subscriptions; not that a subscription to a service or product unrelated to a company's provision of video content satisfies the VPPA's consumer test. *See Ellis*, 803 F.3d at 1256.

United States District Court
Northern District of California

1 using their Facebook credentials, or were otherwise required to disclose their Facebook Profile IDs

2 to use the site. The Plaintiffs' allegation, in short, is not plausible and should not be credited.

3       Plaintiffs' barebones pleading on this issue raise more questions than answers. But the

4 documents referenced by and incorporated into the Complaint provide the beginning of an

5 explanation.[3] *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (citation omitted) (discussing

6 incorporation by reference doctrine). Healthline's Privacy Policy explains that the site uses unique

7 codes that "Advertising platforms, such as . . . Facebook" can match against *their own* user data,

8 like Facebook Profile IDs. (Ex. B "How and When Do We Share Or Disclose Your Information?

9 Advertising."). For the Meta Pixel, Meta can do this matching because *Facebook*—not

10 Healthline—places a cookie containing a user's Facebook Profile ID on a Facebook user's

11 browser once a user uses her browser to log into Facebook.[4] This functionality is why Plaintiffs

12 allege that each visited the website "using the same browser that she uses to login to Facebook,

13 including while she is logged in to Facebook;" that activity makes it more likely that Facebook's

14 cookie and, in turn, the Plaintiffs' Facebook Profile IDs, were present on the Plaintiffs' internet

15 browsers when they visited Healthline's website. Compl. ¶¶ 15, 24. With the cookie in place,

16 when the Plaintiffs' visited websites with the Meta Pixel, *Facebook* was able to store and access

17 cookies including the Facebook cookie on *Plaintiffs'* devices.

18       Critically, the information stored within *Facebook*'s cookie (here, the Facebook Profile ID)

19 is not accessible to Healthline. Rather, it is only accessible to Facebook: "The only servers that can

20 access a particular cookie are those associated with the domain that wrote the cookie.  That means

21 that [a website] can read only [its own] cookies, and it cannot read . . . facebook.com cookies." *In*

22 *re Hulu Priv. Litig.*, 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014) (citation omitted). Thus,

23 while *Facebook* can look for the presence of a *Facebook* cookie on a visitor's browser and, if

24 present, *Facebook* can read its cookie's contents, at no point can a third-party website like

---

25 [3]     The documents referenced by the Complaint include Healthline's Terms of Use and
26 Healthline's Privacy Policy (which is expressly incorporated into that document); these are
attached to the Declaration of Stacy Swinton as Exhibits A and B, respectively.

27 [4]     This is all explained in Meta's Pixel and cookie documentation, which is referenced in the
28 Meta policy documents cited by Plaintiffs in the Complaint. Compl. ¶ 45; *see, e.g.*, "Cookies &
other storage technologies," https://www.facebook.com/policies/cookies/.

1    Healthline access the Facebook cookie's contents or disclose the included Facebook Profile ID to

2    any other party.

3        Accordingly, if Meta received the Facebook Profile IDs of the Plaintiffs when they visited

4    healthline.com, that is a result of transmissions between the users' browsers and Facebook—and

5    not because of any "disclosures" from Healthline. *See In re Google Cookie Placement Consumer*

6    *Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015) (communications through browser internet cookies

7    were between the user and the defendants). Here, when the Plaintiffs' browsers communicated

8    their Facebook Profile IDs to Facebook (i.e., via the Facebook cookies), that was a party-to-party

9    communication *from* Plaintiffs *to* Facebook. Healthline was not involved and, thus, Plaintiffs

10   cannot show a disclosure that violates the VPPA.

11                    **4.    Even if it does allege a disclosure, the Complaint does not plead a**
12                    **"knowing" disclosure.**

13       Finally, even if all deficiencies discussed above were ignored, the VPPA prohibits only

14   "knowing" disclosures of PII. 18 U.S.C. § 2710(b)(1). Here, Healthline's knowledge of its alleged

15   violations is not demonstrated by repeatedly inserting the words "knowingly" or "knew" into

16   individual paragraphs, as Plaintiffs do here. Rather, a plaintiff must "allege *facts* giving rise to a

17   reasonable inference that [Healthline] knowingly or willfully disclosed PII to someone other than

18   the consumer." *Mollett v. Netflix, Inc.*, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012)

19   (emphasis added), *aff'd*, 795 F.3d 1062 (9th Cir. 2015).

20       Plaintiffs' sole factual allegation on this front does not sufficiently allege Healthline's

21   knowledge. As *In re Hulu* explained, "the term 'knowingly' connotes actual knowledge. It is not

22   enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being

23   'aware of what he or she is doing . . . and not act[ing] because of some mistake or accident." 86 F.

24   Supp. 3d at 1095. Rather, "'knowingly' means consciousness of transmitting the private

25   information. It does not merely mean transmitting the code." *Id.* Here, the Plaintiffs only allege

26   that Healthline installed the Pixel on its website, Compl. ¶ 45, but they allege no details to suggest

27   Healthline understood the Pixel would cause analytical website data to be transmitted to Meta and

28   that the data would be "linked" to Plaintiffs' Facebook Profile IDs (which, as noted, Healthline

United States District Court
Northern District of California

12

1    cannot access or control) that is contained in a cookie that Facebook placed on a user's web

2    browser when the user signed up for Facebook in a way that amounted to PII under the Act. Nor

3    do they allege that Healthline was even aware that either Plaintiff even had a Facebook Profile ID.

4          **B.**       **The Complaint Does Not—And Cannot—Allege a UCL Claim**

5          Plaintiffs allege a theory of "unlawful" and "unfair" violations of the UCL, both of which

6    stem from Healthline's allegedly unauthorized disclosure of PII to Meta. The UCL claim fails for

7    three independent reasons.

8              **1.**       **The Plaintiffs lack standing to pursue a UCL claim.**

9          First, it fails for lack of statutory standing. Under the UCL, "Plaintiffs must '(1) establish a

10   loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic*

11   *injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business

12   practice or false advertising that is the gravamen of the claim.'" *Van Patten v. Vertical Fitness*

13   *Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) (quoting *Kwikset Corp. v. Superior Court*, 246

14   P.3d 877, 885 (2011)) (emphasis in original). Thus, to maintain a claim, the Plaintiffs must show

15   that the conduct they complain of caused them to suffer the loss of money or property.

16         Plaintiffs fail to do so. All they allege is that the PII at issue here "constitutes valuable

17   data," and Healthline's alleged disclosures "deprived [them] of control over that information and

18   prevented them from realizing its full value for themselves." Compl. ¶ 54. Neither approach

19   works. The "loss of control" theory fails because the unauthorized disclosure of information is not

20   an economic injury under the UCL. *See*, *e.g.*, *In re Facebook Priv. Litig.*, 572 Fed. Appx. 494 (9th

21   Cir. 2014) (affirming district court dismissal of UCL claim on grounds that loss of personal

22   information, or any associated loss of value of that information is not economic loss under the

23   UCL). Nor do Plaintiffs allege they paid anything to Healthline, so they cannot allege they

24   "overpaid" for any services. *See Stark*, 2022 WL 7652166, at *9.

25         The Plaintiffs' theory that they did not realize the "full value" of their own PII fares no

26   better because the Complaint provides no supporting facts. The Plaintiffs do not allege that they

27   tried or planned to sell their PII to any other party. Without support, the Plaintiffs' theory must be

28   rejected. *See Low v. Linkedin Corp.,* 2011 WL 5509848, at *5 (N.D. Cal. Nov.11, 2011) (holding

13

1    that plaintiff failed to plausibly allege either injury in fact or loss of money or property based on

2    loss of opportunity to capitalize on value of his personal data, where plaintiff failed to allege facts

3    showing "how he was foreclosed from capitalizing on the value of his personal data or how he was

4    'deprived of the economic value of [his] personal information simply because [his] unspecified

5    personal information was purportedly collected by a third party" (citation omitted)); *In re Google*

6    *Android Consumer Priv. Litig.*, 2013 WL 1283236, at *4 (N.D. Cal. Mar. 26, 2013) (finding that

7    plaintiffs failed to plausibly allege either injury-in-fact or loss of money or property based on

8    alleged diminution in value of their PII, where plaintiffs did "not allege they attempted to sell their

9    personal information, that they would do so in the future, or that they were foreclosed from

10   entering into a value for value transaction relating to their PII" as a result of defendants' conduct).

          **2.      The Plaintiffs allege no facts showing that the UCL applies to them.**

12         Second, it fails because the UCL does not protect out-of-state residents without specific

13   allegations tying the at-issue conduct to California. That is not alleged here. "This presumption

14   against the extraterritorial application [of California's consumer protection statutes] has been

15   established in California for almost a century." *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121,

16   1130 (N.D. Cal. 2014) (citation omitted). Thus, where a plaintiff seeks to apply the UCL to non-

17   California residents, she must allege that the defendant's relevant conduct emanated from

18   California. *Id.* (discussing *Sullivan v. Oracle Corp.*, 254 P.3d 237 (2011)). Here, Plaintiffs only

19   allege is that Healthline is headquartered in San Francisco. Compl. ¶ 28. That is not enough.

20   *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1096-97 (C.D. Cal. 2015) (citation omitted)).

          **3.      The allegations do not support a UCL claim.**

22         Third, it fails on the merits. Plaintiffs' UCL claim is completely derivative of their alleged

23   claim under the VPAA. But because they fail to allege a violation of the federal law—for all the

24   reasons discussed above—they cannot bring an "unlawful" UCL claim.

25         Nor can they allege an "unfair" claim. Healthline's Terms and Privacy Policy disclose that

26   the website collects information about how visitors use its website, Ex. B ("Information we collect

27   about you"), and shares such data with "with Advertising platforms, such as . . . Facebook," *see id.*

28   ("How and When Do We Share Or Disclose Your Information?"). Healthline's Privacy Policy

further discloses the use of first- and third-party (e.g., the Facebook cookie containing a

Facebook Profile ID) cookies in connection with its website, and provides resources so that

consumers can make more informed choices about how and whether cookies are used on

healthline.com. *Id.* ("Cookie Policy"). Healthline's accurate disclosure of its own data practices is

hardly "unfair." *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1170-71 (9th Cir. 2012)

(affirming dismissal of UCL claim alleging that defendant failed to mention fees because terms

and conditions disclosed the fees); *Janda v. T-Mobile, USA, Inc.*, 2009 WL 667206, at *6-9 (N.D.

Cal. Mar. 13, 2009) (dismissing with prejudice UCL "unfair" claim based on allegedly hidden fees

where terms disclosed that fees would be charged), *aff'd*, 378 F. App'x 705 (9th Cir. 2010).

> **C.      The Complaint Does Not—And Cannot—Allege an Unjust Enrichment Claim.**

Plaintiffs' standalone claim for unjust enrichment fails because unjust enrichment is not a

cause of action under California law. *See Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059,

1070-1072 (N.D. Cal. 2021) (dismissing unjust enrichment claim on ground that "unjust

enrichment is not a cause of action under California law"); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d

110, 132–33 (N.D. Cal. 2020) (same; collecting California and federal cases). "[C]ourts have

consistently dismissed stand-alone claims for unjust enrichment." *Id.*

Some decisions have suggested "that an unjust enrichment claim is valid in at least some

circumstances," such as where a plaintiff alleged "overpaid" for a defendant's services. *Stark*,

2022 WL 7652166, at *10 (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988,

1000 (2015)). But here, the Plaintiffs do not allege that they paid Healthline anything, so there are

no overpayments to collect. Instead, Plaintiffs embrace a theory of disgorgement, Compl. ¶¶ 17,

26, 93, but plead no facts to suggest that any targeted advertisements they received had anything to

do with the supposed disclosure of their PII, or that such advertisements resulted in any enhanced

profits to Healthline, so the unjust enrichment claim would fail in any event.

**V.      CONCLUSION**

Plaintiffs seek to capitalize on the rash of VPPA causes now flooding federal courts, but

hardly make any effort to show why they are entitled to any relief here. For that and all the reasons

discussed above, their Complaint should be dismissed.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

DATED: November 21, 2022            **ZWILLGEN LAW LLP**

By:  /s/ Anna Hsia
     Anna Hsia (SBN 234179)
     anna@zwillgen.com
     **Attorney for Defendant**
     Healthline Media, Inc.

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO
DISMISS; CASE NO. 22-cv-05059-JD