Anna Hsia (SBN 234179)
ZWILLGEN LAW, LLP
369 Pine Street, Suite 506
San Francisco, CA 94104
Telephone: (415) 590-2341
Facsimile: (415) 636-5965
anna@zwillgen.com

Attorney for Defendant
**HEALTHLINE MEDIA, INC.**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN JEFFERSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>HEALTHLINE MEDIA, INC.<br><br>*Defendant.* | Case No. 4:22-cv-05059-JD<br><br>**DEFENDANT HEALTHLINE MEDIA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**<br><br>Judge:          Hon. James Donato<br><br>Hearing Date: March 9, 2023<br>Time:             10:00 a.m.<br>Courtroom:    11, 19th Floor |

*(left margin, vertical text)* United States District Court
Northern District of California

United States District Court
Northern District of California

## I.      INTRODUCTION

In its Motion to Dismiss (the "Motion"), Healthline identified fundamental flaws with the Plaintiffs' (now Plaintiff's) theory of VPPA liability: the Complaint failed to identify why Healthline's website was subject to the VPPA, to draw any connection between the Plaintiff's relationship with Healthline and any delivery of video content, or to explain how Healthline disclosed information about Plaintiff that it never had. The purported answers Plaintiff provides do not result in viable claims under the VPPA.

For the first two issues, Plaintiff says that *every* website with video content falls under the VPPA and *any* "connection" between a user and a website triggers the VPPA's protections. But Plaintiff's responses do not grapple with the statute's limiting language or the purpose behind it, and her reasoning would transform nearly *every* website into a "video tape service provider" (a "VTSP"). For the third, Plaintiff acknowledges that her allegations of "disclosures" lack factual support and contradict the materials referenced in her Complaint; still, she asks the Court to overlook these shortcomings because Healthline coded the Meta Pixel into its website. This too overlooks the consensus interpretation of the Act: to be liable, a defendant must disclose PII (which is not plausibly alleged here) and consciously understand what is being transmitted (which is also not alleged). In sum, all Plaintiff has alleged is that Healthline's website uses the Meta Pixel—but that does not establish she is entitled to move forward with her claim for relief.

Plaintiff likewise does not salvage her California-specific claims. She fails to explain why she can maintain a claim under the UCL without allegations of an economic injury, any connection to the state, or stating a viable VPPA claim. Nor does she explain why a claim for unjust enrichment should proceed here, given that most courts don't recognize it as a viable cause of action and her Complaint does not allege an actionable wrong.

## II.     ARGUMENT

### A.      Plaintiff Fails to Allege a Viable VPPA Claim.

#### 1.      The VPPA Covers *Some*—Not *All*—Video.

Central to Plaintiff's claim is her assertion that every website that "provides prerecorded video content" is a VTSP. Opp. at 5. Under this reading, because Healthline's website includes on-

1    demand video it—just like the Ninth Circuit[1] and the United States Congress[2]—is a VTSP. That

2    interpretation lacks any basis in the VPPA's text, purpose, or history.

3           The Opposition barely engages with the VPPA's text, but the usual tools of interpretation

4    all support that the VPPA is—as Plaintiff's own cases explain—"about the video content." *In re*

5    *Hulu Priv. Litig.* ("*Hulu I*"), 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012). The VPPA

6    defines a VTSP as a person "engaged in the business . . . of rental, sale, or delivery of prerecorded

7    video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). We must give

8    "effect, if possible, to every clause and word of a statute" so that "no clause, sentence, or word [is

9    made] superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (cleaned

10   up). Reading the VPPA to apply to "all" video, as Plaintiff suggests, would render the terms

11   "prerecorded," "cassette tapes," and "similar" superfluous.

12          Or try *expressio unius est exclusion alterius*, which directs that where "a statute designates

13   certain persons, things, or manners of operation, all omissions should be understood as

14   exclusions." *Copeland v. Ryan*, 852 F.3d 900, 907 (9th Cir. 2017). Congress's choice to apply the

15   VPPA to "prerecorded video cassette tapes or similar audio visual materials" thereby excluded

16   from the statute's scope those audio visual materials which are *not* similar to prerecorded video

17   cassette tapes. The maxim of *ejusdem generis* is also instructive. Where, as here, "general words

18   follow specific words in a statutory enumeration, the general words are usually construed to

19   embrace only objects similar in nature to those objects enumerated by the preceding specific

20   words. *Yates v. United States*, 574 U.S. 528, 545 (2015). *See also First Fed. Sav. & Loan Ass'n v.*

21   *State Tax Comm'n*, 437 U.S. 255, 262 (1978) ("When Congress required that federal savings and

22   loan associations be placed in the same classification as 'similar' state institutions, it certainly did

23   not assume that every local and mutual or cooperative thrift and home-financing institution is

24   similar to a federal association."). By identifying a specific category ("prerecorded video cassette

25   tapes") followed by a more general category ("similar audio visual materials"), Congress made

26   clear its intent that the latter be confined by the former.

27

28   _____

[1] https://www.ca9.uscourts.gov/media/
[2] https://www.congress.gov/video

DEFENDANT HEALTHLINE MEDIA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE
COMPLAINT; CASE NO. 22-CV-05059-JD

United States District Court
Northern District of California

1    Plaintiff's position does not account for these straightforward conclusions. In terms of the

2    VPPA's purported breadth, the Opposition cites cases holding that the VPPA applies to different

3    video *formats* and is "medium-neutral." Opp. at 4 (citing *In re Vizio, Inc., Consumer Priv. Litig.*,

4    238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)); *Hulu I*, 2012 WL 3282960, at *5. But whether a

5    defendant can be a VTSP when delivering video online (as opposed to via cassette tape) is not

6    disputed.  Rather, Healthline disputes that the *content* of the video its website offers is covered by

7    the VPPA. Plaintiff's cases do not examine the VPPA for this issue, a matter of no surprise

8    because the content providers involved in those cases—"Netflix, Hulu, YouTube, and Amazon

9    Instant Video"—all deal in the same material (to wit, "entertainment, movies, TV shows and

10   more"). Such materials were or would have been available to rent at the video store that led to the

11   VPPA's enactment. *See In re Vizio*, 238 F. Supp. 3d at 1222.

12       Plaintiff similarly points to the amendment of the VPPA and suggests that Congress

13   understood that the Act would apply to the "electronic distribution of videos." Opp. at 5 (quoting

14   *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 488 (1st Cir. 2016)). That may be,

15   but there is no indication Congress sought to broaden the scope of the video *content* covered by

16   the VPPA. To the contrary, the Third Circuit in *In re Nickelodeon* emphasized a 2012 Senate

17   report describing that the VPPA has and would continue to cover content "similar" to Judge

18   Bork's movie rentals:

19       At the time of the [1988 law's] enactment, consumers rented movies from video
         stores. The method that Americans used to watch videos in 1988—the VHS cassette
20       tape—is now obsolete. In its place, the Internet has revolutionized the way that
         American consumers *rent and watch movies and television programs*. Today, so-
21       called "on-demand" cable services and Internet streaming services allow consumers
         to *watch movies or TV shows* on televisions, laptop computers, and cell phones.
22

23   827 F.3d 262, 288 (3d Cir. 2016) (emphases added) (citing S. Rep. No. 112-258, at 2 (2012)).

24       Finally, the Opposition dismisses the cases cited by Healthline because they address parts

25   of the statute other than the definition of a VTSP. Opp. at 4, 6 n.6. That misses the point. The

26   cases cited by Healthline *all* emphasize that the VPPA is a narrow statute directed at specific

27   activity. Thus, rather than expansively interpreting the VPPA beyond its plain text as Plaintiff

28   suggests, the available appellate decisions *all* interpret it in line with the statute's text and the

United States District Court
Northern District of California

3

1    enacting Congress's intent. *See In re Nickelodeon*, 827 F.3d at 288 (refusing to expand definition

2    of PII); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (grounding

3    interpretation with "the regime that the VPPA's enacting Congress likely had in mind").

4    Healthline argues that the same approach guiding those decisions applies to the entire statute,

5    including the definition of a VTSP.

**2.    Plaintiff has alleged no facts in support of her allegation that Healthline is engaged in the business of providing video tape services.**

7    The Opposition argues that Healthline is "engaged in the business" of delivering video

8    content subject to the VPPA because it has video content on its website. Opp. at 5-6. That sets the

9    bar too low. The *In re Vizio, Inc.* court made clear that the VPPA applies in the post-video rental

10   store world, but only to those businesses who are similarly "engaged in the business" of delivering

11   video content subject to the VPPA. 238 F. Supp. 3d. at 1222 (noting that Vizio "has created a

12   supporting ecosystem to seamlessly deliver video content to consumers (including entering into

13   agreements with content providers such as Netflix and Hulu)"). Even Plaintiff acknowledges that a

14   business subject to the VPPA "*must* be 'substantially involved in the conveyance of video content

15   to consumers [and] significantly tailored to serve that purpose.'" Opp. at 6 (emphasis added)

16   (quoting *In re Vizio*, 238 F. Supp. 3d at 1221). But unlike *In re Vizio*—where the court explained

17   that the defendant's product was specifically designed to access covered VPPA content (i.e.,

18   movies and television shows), 238 F. Supp. 3d at 1221—here, the simple observation that there is

19   video content on Healthline's website does not support Plaintiff's conclusory allegation that

20   Healthline's business is "substantially involved" or "significantly tailored" to deliver video

21   content (particularly video content that is covered by the VPPA) to consumers.

22          Plaintiff's cases add nothing to this point. Plaintiff points to *Lebakken v. WebMD, LLC*

23   where, in a footnote, the court held that the plaintiff sufficiently alleged that WebMD was a VTSP.

24   No. 1:22-CV-644-TWT, 2022 WL 16716151, at *3 n.2 (N.D. Ga. Nov. 4, 2022). But the footnote

25   has little value; it contains no analysis whatsoever and, moreover, acknowledges that the parties

26   hadn't disputed or briefed the treatment of WebMD as a VTSP. *Id.* Other of Plaintiff's cases

27   similarly provide no analysis. *See*, *e.g.*, *Belozerov v. Gannett Co.*, No. CV 22-10838-NMG, 2022

28

United States District Court
Northern District of California

4

1   WL 17832185, at *3 (D. Mass. Dec. 20, 2022) (relying on prior First Circuit decision, where the

2   definition of a VTSP was not at issue or analyzed); *Ambrose v. Bos. Globe Media Partners LLC*,

3   No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (cursory denial of

4   motion to dismiss, citing "factual disputes"). Or they involve allegations of video content

5   obviously covered by the VPPA—i.e., ones regarding the defendant's "rental, sale, or delivery of

6   . . . [content such as] television shows, documentaries, movies, and other audiovisual content."

7   *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *4

8   (S.D.N.Y. Nov. 17, 2022); *see also In re Facebook, Inc., Consumer Priv. User Profile Litig.,* 402

9   F. Supp. 3d 767, 799 (N.D. Cal. 2019) (addressing allegations regarding delivery of content from

10  providers like Netflix).

11          **3.       Signing up for a newsletter does not make Plaintiff a VPPA subscriber.**

12          The Opposition argues that a VPPA "subscriber" need only allege an "ongoing

13  commitment" to a defendant's business, even if it is unrelated to any provision of video services.

14  Opp. at 7-8. In support, Plaintiff points to *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256

15  (11th Cir. 2015). Opp. at 7. But *Ellis* agreed with the approach sketched out in *Austin-Spearman v.*

16  *AMC Network Entertainment LLC*, where Judge Buchwald expressed skepticism over whether "a

17  plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the

18  providers' services that are distinct and set apart from its provision of videos." 98 F. Supp. 3d 662,

19  671 (S.D.N.Y. 2015). Judge Buchwald's view is also consistent with the holdings of *Perry*, and

20  *Yershov*, all of which looked for a "subscriber" relationship to the defendant's delivery of video

21  content. Mot. at 7-8. *Lebakken* does not dictate otherwise. There, defendant's email newsletter

22  itself had video content and the plaintiff had to log into the defendant's website to access all

23  content. 2022 WL 16716151, at *2-3. Plaintiff does not (and cannot) allege either circumstance

24  here.

25          *Ellis* is moreover in accord with these decisions and supports Healthline's conclusion. That

26  decision identified a "common thread," which Plaintiff cites, Opp. at 7, in connecting the different

27  "*dictionary definitions* of the term 'subscriber,'" not how the term is used in the context of the

28  VPPA. *Ellis*, 803 F.3d at 1256 (emphasis added). Healthline's reading of *Ellis* is reinforced by the

United States District Court
Northern District of California

5

1    decision's favorable citation to the district court's opinion in *Yershov*, which recognized that a

2    person who accesses video without having to give anything in exchange for it is not a

3    "'subscriber' within the meaning of the VPPA. In common parlance, an individual who watches

4    video [without such a commitment] is simply known as a 'user.'" *Yershov v. Gannett Satellite*

5    *Info. Network, Inc.*, 104 F. Supp. 3d 135, 148 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir.

6    2016); *see Ellis*, 803 F.3d at 1256 (discussing the lower court opinion in *Yershov* as "persuasive").

7    That perfectly sums up the situation here: with respect to the video content she allegedly watched,

8    no one would refer to Plaintiff as anything other than a "user" or "visitor" of Healthline's website.

9    She could not log into the site and did not receive any access to video content by virtue of signing

10   up to receive an emailed newsletter. She is, in sum, not a subscriber under the VPPA.

11          Plaintiff also argues that the purpose of the VPPA would be "undermine[d]" if a covered

12   "subscriber" must demonstrate a relationship to a defendant's provision of video content, because

13   the VPPA creates a right for consumers to "control their [video watching] information." Opp. at 9-

14   10. But the VPPA was enacted to address a specific problem; it is not a one-size-fits-all solution to

15   every video-related privacy concern. Indeed, the Act's legislative materials envisioned the Act not

16   as a cure-all, but as the next in a "long line of statutes passed by the Congress to extend privacy

17   protection to records that contain information about individuals," including the Cable

18   Communications Privacy Act of 1984, which already protected the "viewing habits" of cable

19   television subscribers. S. Rep. 100-599, at 2 (Oct. 5. 1988). Further, Plaintiff's own allegations

20   undermine her argument. As Plaintiff explains it, the Meta Pixel results in the disclosure of PII for

21   *all* of a website's visitors that are also Facebook users. But while *all* of these individuals would

22   "lose control" of their PII, even Plaintiff must admit that the VPPA only provides *some* of them—

23   i.e., the renters, purchasers, or subscribers, 18 U.S.C. § 2710(a)(1)—a remedy. This confirms the

24   VPPA's concern with some—but not all—persons' control over their video watching history. And

25   it supports Healthline's commonsense view: individuals that subscribe, in some fashion, to a

26   VTSP's provision of video content are protected by the VPPA; "users" that freely use and enjoy

27   the same access provided to every other user on the internet are not.

28

DEFENDANT HEALTHLINE MEDIA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE
COMPLAINT; CASE NO. 22-CV-05059-JD

*(left margin)* United States District Court  Northern District of California

United States District Court
Northern District of California

**4.    Plaintiff Fails to Allege a Knowing Disclosure of PII.**

In response to Healthline's argument that the Complaint fails to allege a disclosure of PII, Plaintiff devotes significant space to arguing that an FID is identifying for the purposes of the VPPA. *See* Opp. at 10-11. But Healthline did not argue to the contrary.

What Healthline *did* argue was that (i) the materials incorporated by reference into the Complaint show that Plaintiff's FID was stored in a Facebook cookie saved on her browser, and (ii) Healthline cannot access the data (including the FID) stored in Facebook's cookie, so it could not have disclosed it in violation of the VPPA. Mot. at 10-12. Plaintiff offers only marginal responses to those arguments. On the first point, Plaintiff does not contest—and thus admits—that the materials cited and referenced in the Motion were incorporated into the pleadings. Rather, she only asks the Court not to consider them if they "contradict well-pled factual allegations." Opp. at 10 n.8 (quoting *AliveCor, Inc. v. Apple Inc.*, 2022 WL 833628, at *4 (N.D. Cal. Mar. 21, 2022)). That issue is not relevant here because there are no *factual* allegations to contradict: the Complaint does not allege *facts* establishing that Healthline had any way of knowing Plaintiff's or any other website visitor's FID, it simply *concludes* Healthline did. Mot. at 10-11. Given the explanations provided by the materials cited in Healthline's Motion, *id.* at 11, Plaintiff's unsupported and conclusory allegations that Healthline nevertheless "disclosed" her FID without the ability to access it in the first instance need not be credited. *See Harris v. Newsom*, No. CV 19-04904 DSF (RAO), 2020 WL 7084548, at *1 (C.D. Cal. Sept. 22, 2020) (citing *Petrie v. Electronic Game Card, Inc.*, 761 F.3d 959, 964 n.6 (9th Cir. 2014) ("The Court may consider exhibits attached to the pleading and incorporated by reference, but is not required to blindly accept conclusory allegations, unwarranted factual deductions, or unreasonable inferences.")).

On the second point, Plaintiff says that a factual record is needed to determine whether, in 2022, a browser cookie placed by one entity can be accessed by others, as was the case in 2014. Opp. at 12 (citing *In re Hulu Priv. Litig.* ("*Hulu II*"), 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014)). This argument borders on silly. A cookie is a cookie. The first principle that website cookies are meaningful only to the companies that create them has been established and accepted by courts since at least 2001. *See, e.g., In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497,

513 (S.D.N.Y. 2001) (considering whether tracking cookies violate Title III's prohibition on wiretapping and noting that "in every practical sense" a cookie is "both 'of' and 'intended for'" the company that creates, populates and places it). In *Hulu II* itself, in fact, the court in describing a cookie's operation considered not only *Facebook* (now Meta) cookies, but also cookies issued by other websites, finding: "The only servers that can access a particular cookie are those associated with the domain that wrote the cookie. That means that Hulu can read only hulu.com cookies, and it cannot read comScore.com cookies or facebook.com cookies." *Hulu II*, 2014 WL 1724344, at *4. There is no basis—and Plaintiff has alleged none—to believe that Facebook's cookies, which have been at the center of privacy-based lawsuits for over a decade, now operate any differently.

Plaintiff also suggests that even if Healthline cannot read Facebook's cookies (it cannot), it might still be liable if Healthline "knew what [the Facebook cookies] contained and knew that it was transmitting PII." Opp. at 12 (quoting *Hulu II*, 2014 WL 1724344, at *15-17). But this is where the posture of *Hulu II* matters: here, the Court can rely only on the Complaint and Plaintiff does not suggest much less meaningfully allege that Healthline knew whether its visitors' browsers had Facebook cookies or what was contained therein.

Finally, even if the Complaint did allege a plausible disclosure, it does not allege that it was made knowingly. To this end, the Opposition doubles down on the pleadings and repeats its allegation that Healthline "programmed" the Meta Pixel into its website. Opp. at 12-13. But "[i]t is not enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing'"; rather, "'knowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code." *In re Hulu Priv. Litig.* ("*Hulu 2015*"), 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015). Plaintiff does not allege that Healthline understood including the Pixel in its website code would result in the disclosure of both Plaintiff's FID and viewing information, or that Facebook would combine those data points to create PII that is potentially governed by the VPPA. *See also Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017) (explaining that the court in *Hulu 2015* "found that a plaintiff must prove that the defendant knew that a third party would

8

actually link information it had with other information conveyed and become aware that a particular person had in fact purchased a particular video"), *R&R adopted*, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017).

### B.    Plaintiff Does Not State a Viable UCL Claim.

Plaintiff also fails to salvage her claim under the UCL. With respect to her statutory standing, Plaintiff does not contest that any purported loss of control over her information, or any theory of "overpayment"— the theory addressed in *In re Adobe Systems Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014), *see* Opp. at 13—do not apply here. Instead, she argues that she sufficiently alleges a "loss of value" in her PII because the word "market" appears in her Complaint. Opp. at 13; *see* Compl. ¶ 54. But unlike the single case she cites, Plaintiff does not allege *any* facts showing that there is a market for the kind of information at issue here *or* that she planned to avail herself of it. Opp. at 13 (citing *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *14-15, *30 (N.D. Cal. May 27, 2016)). And, even if she had, she still does not allege facts to support her implausible allegation that Healthline "obtained" and then disclosed the information at issue here (i.e., FIDs and the viewing histories of website visitors), so the claim fails in any event. *See supra*, § A.4.

Next, Plaintiff says that she can—as a non-California resident—assert a UCL claim because Healthline's website has a choice of law clause. Opp. at 13. Wrong again. "A contractual choice of law provision that incorporates California law presumably incorporates all of California law—including California's presumption against extraterritorial application of its law." *Debono v. Cerebral Inc.*, No. 22-CV-03378-AGT, 2023 WL 300141, at *2 (N.D. Cal. Jan. 18, 2023). And under California law, overcoming this presumption requires more than an allegation that the defendant is headquartered in the state, *id.* (quoting *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 224-25 (1999)), which is all Plaintiff alleges, Opp. at 14. Plaintiff cites *Schertzer v. Bank of Am.*, *N.A.*, but that case dealt not with the *plaintiff's* standing to bring a UCL claim (which was uncontested), but with whether the court would dismiss the claims asserted on behalf of absent class members without the benefit of *any* factual record. 489 F. Supp. 3d 1061, 1084-85 (S.D. Cal. 2020). Here, Plaintiff must allege some facts to support *her* standing to assert a UCL

9

United States District Court
Northern District of California

claim as an out-of-state resident. She does not.

Even if Plaintiff could assert her standing, however, she has not sufficiently alleged a UCL claim. Because she does not state a viable VPPA claim, she does not allege an "unlawful" UCL claim, or an "unfair" claim tethered to the VPPA. And any other articulations of any UCL test fail, *see* Opp. at 14, for the simple reason that the Complaint does not plausibly allege that *Healthline* disclosed Plaintiff's FID to anyone, *see supra* § A.4. And even if there were a disclosure, it was completely in line with Healthline's Terms of Use and incorporated Privacy Policy, *see* Mot. at 14-15. This readily defeats Plaintiff's unsupported allegation that Healthline's data practices were implemented without her consent.

### C.   Plaintiff's Unjust Enrichment Claim Fails.

Finally, Plaintiff identifies no reason for her unjust enrichment claim to move forward. First, she says there is "some disagreement" about whether a claim for unjust enrichment may be maintained. Opp. at 14-15. That "disagreement" does not help her; the "*majority* of state and federal district courts in California do not recognize unjust enrichment as a freestanding claim." *Baxter Bailey & Assocs. v. Ready Pac Foods, Inc.*, 2020 WL 1625257, at *6 (C.D. Cal. Feb. 26, 2020) (emphasis added).

On the merits, Plaintiff says theories of unjust enrichment can proceed on a theory of disgorgement. Opp. at 15. But the Complaint did not allege any facts tying the alleged disclosure of *her* PII to any profits realized by Healthline. Mot. at 15. Nor does the Opposition do so. And, even if Plaintiff had alleged as much, the claim fails for the same reason as her claims under the VPPA and UCL: the Complaint does not allege an "actionable wrong," so any alleged enrichment to Healthline was not unjust. *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011) ("There being no actionable wrong, there is no basis for the relief.").

### III.   CONCLUSION

For the reasons discussed here and in Healthline's Motion, the Complaint should be dismissed.

DEFENDANT HEALTHLINE MEDIA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT; CASE NO. 22-CV-05059-JD

DATED: February 8, 2023                    **ZWILLGEN LAW LLP**

By:   /s/ Anna Hsia
    Anna Hsia (SBN 234179)
    anna@zwillgen.com
    **Attorney for Defendant**
    Healthline Media, Inc.


**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

    /s/ Anna Hsia
    Anna Hsia

United States District Court
Northern District of California

DEFENDANT HEALTHLINE MEDIA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT; CASE NO. 22-CV-05059-JD