1   Anna Hsia (SBN 234179)
    ZWILLGEN LAW, LLP
2   369 Pine Street, Suite 506
    San Francisco, CA 94104
3   Telephone: (415) 590-2341
    Facsimile: (415) 636-5965
4   anna@zwillgen.com

5

6   Jeffrey Landis (*pro hac vice*)
    Dana Brusca (*pro hac vice*)
7   ZWILLGEN PLLC
    1900 M Street NW, Suite 250
8   Washington, DC 20036
    Telephone: (202) 296-3585
9   Facsimile: (202) 706-5298
    jeff@zwillgen.com
10  dana@zwillgen.com

11
    Attorneys for Defendant
12  **HEALTHLINE MEDIA, INC.**

13

14              **UNITED STATES DISTRICT COURT**

15            **NORTHERN DISTRICT OF CALIFORNIA**

16

17  ALEXANDRA HEATHER and KELSEY          Case No.  3:22-cv-05059-JD
    NELSON, individually and on behalf of all
18  others similarly situated,               **DEFENDANT HEALTHLINE MEDIA,**
                                             **INC.'S NOTICE OF MOTION AND**
19                                           **MEMORANDUM OF POINTS AND**
              Plaintiffs,                    **AUTHORITIES TO DISMISS THE FIRST**
20                                           **AMENDED COMPLAINT**
         v.
21                                           Judge:        Hon. James Donato
    HEALTHLINE MEDIA, INC.                   Hearing Date: Aug. 31, 2023
22                                           Time:         10:00 a.m.
              Defendant.                     Courtroom:    11, 19th Floor
23

24

25

26

27

28

United States District Court
Northern District of California

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO
DISMISS; CASE NO. 22-cv-05059-JD

**TO THE COURT AND ALL PARTIES OF RECORD:**

PLEASE TAKE NOTICE THAT on August 31, 2023, or as soon thereafter as this matter may be heard, before the Honorable James Donato in Courtroom 11 of this Court, located on the 19th Floor of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Healthline Media, Inc. ("Defendant" or "Healthline") will, and hereby does, move the Court for an order granting its Motion to Dismiss the First Amended Complaint. This Motion is made based on Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs' allegations fail to state any valid claim. This Motion will be based upon this Notice; the accompanying Memorandum of Points and Authorities; the Declaration of Stacy Swinton; the Declaration of Jeffrey Landis; the complete record in this action; and such other matters and arguments as may come before the Court, including those raised in connection with reply briefing and oral argument relating to this Motion.

Dated: July 10, 2023

ZWILLGEN PLLC

By:  /s/ Jeffrey Landis
Jeffrey Landis (*pro hac vice*)
jeff@zwillgen.com

**Attorney for Defendant**
Healthline Media, Inc.

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ................................................................................................ 2

        A.      Healthline and Healthline.com .................................................................. 2

        B.      Bezzy and Bezzy.com ................................................................................ 3

        C.      The Meta Pixel ........................................................................................... 3

        D.      The Named Plaintiffs .................................................................................. 4

        E.      Plaintiffs' VPPA Claim .............................................................................. 5

III.    LEGAL STANDARD ....................................................................................... 5

IV.     ARGUMENT ..................................................................................................... 5

        A.      The FAC Does Not Allege a Viable Claim Under the VPPA ..................... 5

                1.      Plaintiffs are not VPPA Consumers. ............................................... 5

                2.      Healthline is not a Video Tape Service Provider. ............................ 9

                        a.      The VPPA only concerns audiovisual content "similar to"
                                prerecorded video cassette tapes. ......................................... 9

                        b.      Healthline is not "engaged in the business" of delivering
                                videos ................................................................................... 11

                3.      The FAC does not plausibly allege that Healthline disclosed PII
                        to Meta. ......................................................................................... 12

                4.      Even if it does allege a disclosure, the FAC does not plead a
                        "knowing" disclosure. ................................................................... 14

        B.      The FAC Does Not—And Cannot—Allege an Unjust Enrichment
                Claim. .................................................................................................... 15

V.      CONCLUSION ............................................................................................... 15

United States District Court
Northern District of California

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

1

## **TABLE OF AUTHORITIES**

2

**Cases**                                                        **Page(s)**

3

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 5

4

*Austin-Spearman v. AMC Network Ent. LLC*,
    98 F. Supp. 3d 662 (S.D.N.Y. 2015) ................................................................. 8

5

6

*Baxter Bailey & Assocs. v. Ready Pac Foods, Inc.*,
    2020 WL 1625257 (C.D. Cal. Feb. 26, 2020) ................................................. 15

7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 5

8

9

*Carroll v. General Mills, Inc.*,
    2023 WL 4361093 (C.D. Cal. June 26, 2023) ................................................ 11

10

11

*Carter v. Scripps Networks, LLC*,
    2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) .......................................... 6, 7, 8

12

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) .......................................................................... 12

13

14

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) ......................................................................... 8

15

16

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) .................................................................................... 10

17

*EVO Brands, LLC v. Al Khalifa Grp. LLC*,
    2023 WL 2768743 (C.D. Cal. Feb. 23, 2023) ................................................. 3

18

19

*First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*,
    437 U.S. 255 (1978) ........................................................................................ 10

20

*Gardener v. MeTV*,
    2023 WL 4365901 (N.D. Ill. July 6, 2023) ................................................. 6, 8

21

22

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010) ........................................................................................... 6

23

*Hill v. Roll Int'l Corp.*,
    195 Cal. App. 4th 1295 (2011) ....................................................................... 15

24

25

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
    806 F.3d 125 (3d Cir. 2015) ........................................................................... 14

26

27

28

United States District Court
Northern District of California

*In re Hulu Priv. Litig.*,
 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .................................................... 13

*In re Hulu Privacy Litig.*,
 86 F. Supp. 3d 1090 (N.D. Cal. 2015) ............................................... 12, 14, 15

*In re Nickelodeon Consumer Priv. Litig.*,
 827 F.3d 262 (3d Cir. 2016)..................................................... 10, 11, 14

*In re Vizio, Inc., Consumer Priv. Litig.*,
 238 F. Supp. 3d 1204 (C.D. Cal. 2017)................................................... 11

*King v. Burwell*,
 576 U.S. 473 (2015) ..................................................................... 6

*Knievel v. ESPN*,
 393 F.3d 1068 (9th Cir. 2005)............................................................. 3

*Lebakken v. WebMD, LLC*,
 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022)................................................... 8

*MCI Telecomm. Corp. v. AT&T Co.*,
 512 U.S. 218 (1994) ..................................................................... 9

*McMillan v. Amazon.com, Inc.*,
 983 F.3d 194 (5th Cir. 2020)............................................................. 11

*Mollett v. Netflix, Inc.*,
 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) ................................................. 14

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
 572 U.S. 545 (2014) ..................................................................... 6

*Tovar v. Sessions*,
 882 F.3d 895 (9th Cir. 2018)............................................................. 6

*United States v. Stanko*,
 491 F.3d 408 (8th Cir. 2007)............................................................. 10

*Warren v. Fox Fam. Worldwide, Inc.*,
 328 F.3d 1136 (9th Cir. 2003)........................................................ 5, 11

**Statutes**

10 U.S.C. § 949p-5 ....................................................................... 14

15 U.S.C. § 6821 ......................................................................... 14

18 U.S.C § 2710 .................................................................... *passim*

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

1

**Other Authorities**

2

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 5

3

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 5

4

S. Rep. No. 100-599 ........................................................................................................ 7

5

*Similar*, Black's Law Dictionary (6th ed. 1990) .......................................................... 9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

## I.      INTRODUCTION

In their First Amended Complaint (the "FAC"), Plaintiffs Alexandria Heather and Kelsey Nelson ("Plaintiffs") seek to push the Video Privacy Protection Act ("VPPA") even further from its text and intended purpose. They still contend that the statute should apply to businesses that are nothing like the video rental store patronized by Judge Robert Bork. And they still contend that the statute should cover all of a business's customers, regardless of whether those customers purchased, rented, or subscribed to video content provided by that business. But with the FAC, these Plaintiffs seek to break even more ground: they assert that a defendant is not only liable to its *own* customers, but also to the customers of *other* businesses that hyperlink to video content hosted on a defendant's website.

Despite this first-of-its-kind expansion—which isn't supported by the statute in the slightest—Plaintiffs' theory of VPPA liability suffers from the same fundamental defects as before. It should be dismissed.

**First**, neither Plaintiff is a VPPA consumer. Both Plaintiffs allege that their receipt of an emailed newsletter makes them a VPPA "subscriber" to Healthline. But as a starting point, the VPPA only provides a cause of action to renters, purchasers, or subscribers of a defendant's *audio-video content*. Plaintiffs do not allege that their newsletter subscriptions—including Plaintiff Nelson's subscription to and registration with Bezzy, a separate website and service that Plaintiffs do not allege hosts any video at all—provided them with any video content or access to video content on Healthline's website.

**Second**, Healthline is not a VPPA defendant. The FAC does not allege that Healthline delivers video content "similar to" prerecorded video tapes, and does not allege that the delivery, rental, or sale of such content is a focus of its business. Courts have agreed that the VPPA does not apply to a business simply because its website includes video content.

**Third**, the Plaintiffs do not plausibly allege a VPPA disclosure. Plaintiffs' claim depends on Healthline's alleged transmission of their Facebook Profile IDs in connection with a record of the videos they watched on the Healthline website. But the FAC pleads no actual factual content suggesting that happened. Healthline has no way of accessing Plaintiffs' Facebook Profile IDs in

1

United States District Court
Northern District of California

the first instance and, thus, Healthline had no way of disclosing them. And the VPPA itself does not provide liability for entities that passively "cause" a transmission.

**Fourth**, the Plaintiffs do not allege any *facts* supporting Healthline's knowing transmission of their personal video viewing records to Meta. Instead, they just sprinkle the word "knowing" across the pleadings, which does nothing more than echo the statute's requirements.

The Plaintiffs' claim for unjust enrichment fares no better. As before, it is tethered to their claim under the VPPA and fails along with it.

The VPPA is a statute that ensures Americans can enjoy privacy in the entertainment choices they make in their own homes. But it was, and is, a limited statute that does not apply just because a business's website includes video. The FAC should be dismissed.

## II.     BACKGROUND

### A.     Healthline and Healthline.com

Healthline Media, Inc. is a Delaware corporation, with its principal place of business in San Francisco. FAC (dkt. 42) ¶ 32. Healthline's website, healthline.com, provides information to visitors about physical and mental health. *Id.* ¶ 39. The website includes, among other topics, individual pages about health conditions, resources about wellness topics, and provides links to communities and products related to the various subjects discussed on the site. Some pages of Healthline's website supplement health-related articles with video content. *See*, *e.g.*, *id.* ¶ 44. All of this content—including any related video—is freely available to every internet user. The FAC does not allege that Healthline uses any logins, paywalls, or other means through which users can access restricted content on the website.

Individuals can sign up for Healthline "e-newsletters" that, like the other content provided by Healthline, "contain a variety of health and wellness-related content, such as advice related to health and wellness, links to relevant articles, and news stories." *Id.* ¶ 41. The FAC does not allege that Healthline's e-newsletters contain video content. Anyone can sign up for Healthline's e-newsletters by providing their email address. (Ex. A to Declaration of Jeffrey Landis ("Landis

United States District Court
Northern District of California

1   Decl.").[1]) They are not required or even asked to provide any other personal information, such as

2   their names, whether they are Facebook users, their Facebook Profile IDs, or information about

3   the video content they watch—or would like to watch—on Healthline's website. *Id.*

4   **B.     Bezzy and Bezzy.com**

5          Bezzy is a separate website, located at bezzy.com, that provides information for

6   individuals that have specific chronic health conditions. *Id.* ¶¶ 3 n.1, 22. Unlike the Healthline

7   website, users *can* register for Bezzy and log into the website by providing their email address.[2]

8   *Id.* ¶ 28. Also unlike the Healthline website, the FAC does not allege that the Bezzy website hosts

9   any video content, let alone that Plaintiffs watched video content on that website, or that the

10  website transmitted information to Facebook. Instead, the FAC alleges only that certain of Bezzy's

11  webpages include hyperlinks to *other* websites, including to healthline.com, that include video

12  content. *Id.* ¶ 23. Plaintiffs allege that Bezzy is an "affiliate" of, and "owned and operated by,"

13  Healthline. *Id.* ¶¶ 3 n.1, 22.

14         The FAC alleges that Bezzy also lets users sign up for "email newsletters." *Id.* ¶ 23. To

15  sign up, Plaintiffs allege that—like the Healthline e-newsletters—users must provide their email

16  addresses. *Id.* The FAC alleges that the Bezzy e-newsletters contain links to articles on bezzy.com.

17  *Id.* The FAC does not allege that the Bezzy e-newsletters contain video or hyperlinks to any

18  website other than bezzy.com.

19  **C.     The Meta Pixel**

20         The FAC alleges that Healthline incorporated the Meta Pixel into the code for

21

22  ---

    [1] The Court can consider the Healthline newsletter sign up page because the FAC links to and
23  relies on it. FAC ¶ 41 n.6. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (citation
    omitted) (discussing incorporation by reference doctrine). A judicially noticeable version of the
24  webpage is also saved on the Internet Archive's Wayback Machine. *See EVO Brands, LLC v. Al
    Khalifa Grp. LLC,* No. 2:22-CV-03909-AB-MAR, 2023 WL 2768743, at *4 (C.D. Cal. Feb. 23,
25  2023) ("Courts have taken judicial notice of internet archives in the past, including Archive.org's
    'Wayback Machine,' finding that Archive.org possesses sufficient indicia of accuracy that it can
26  be used to readily determine the various historical versions of a website.") (collecting cases).

    [2] The FAC includes no details about the Bezzy signup processes. The Court may, however,
27  consider the version of the Bezzy signup page saved on the Internet Archive's "Wayback
    Machine" for the date(s) referenced in the FAC (*see, e.g.*, FAC ¶ 22 n.3). *See EVO Brands*, 2023
28  WL 2768743, at *4. A screenshot of the archived version of the Bezzy community signup page
    allegedly visited by Plaintiff Nelson is attached to the Landis Decl. as Exhibit B.

United States District Court
Northern District of California

healthline.com. *Id.* ¶ 4. Plaintiffs allege that if an individual accesses Healthline's website on a browser that is also logged into Facebook, the Meta Pixel will send information about the user— i.e., their Facebook Profile ID and the "title of the video that the user watched"—to Meta. *Id.* ¶¶ 4-6. While Plaintiffs allege that Healthline knowingly installed the Pixel into the code of Healthline's website, they do not allege that Healthline has any way of knowing when the Pixel allegedly sends information to Meta or the contents of any such communications—including, most relevant here, whether any Facebook Profile ID information is transmitted. Rather, they allege that Healthline "knowingly causes" these communications by incorporating the Pixel onto the Healthline website. *Id.* ¶ 86.

The FAC does not allege that the Meta Pixel is incorporated into Bezzy's website. Nor do Plaintiffs allege that the Meta Pixel on healthline.com has any way of determining whether visitors to the site came from bezzy.com, are registered Bezzy users, or subscribe to a Bezzy newsletter.

### D.      The Named Plaintiffs

Plaintiff Heather alleges that she provided Healthline with her email address and, in turn, receives e-newsletters addressing the "health and wellness-related content" featured on Healthline's website. *Id.* ¶ 12. She alleges that she has followed links in Healthline's e-newsletters to pages on Healthline's website where she viewed video content. *Id.* ¶ 17. Because she uses the same browser to access both Facebook and Healthline's website, Heather alleges that the Meta Pixel present on healthline.com transmitted her Facebook Profile ID and the "title of each prerecorded video she viewed" to Meta. *Id.* ¶ 18.

Plaintiff Nelson alleges that she registered for the Bezzy website and subscribed to a Bezzy email newsletter by providing her email address. *Id.* ¶¶ 22-23. Nelson alleges that she has followed hyperlinks in her e-newsletters to articles on the Bezzy website. *Id.* ¶ 23. She says that from there she followed hyperlinks in those articles to separate webpages on Healthline's website, and that some of *those* webpages include video content. *Id.* She also says that she used her login to access the Bezzy website and, once logged in, followed hyperlinks to pages of Healthline's website that contained videos. *Id.* ¶ 28. Finally, like Plaintiff Heather, Nelson says that the browser she uses when accessing Healthline's (not Bezzy's) website is the same one she uses to

4

United States District Court
Northern District of California

use Facebook and, in turn, when she watched video on healthline.com the Meta Pixel transmitted her Facebook Profile ID and the "title of each video she viewed" to Meta. *Id.* ¶ 27, 29.

### E.    Plaintiffs' VPPA Claim

Plaintiffs seek relief for themselves and a national class of people who "subscribed to Healthline"—even though Nelson never subscribed to Heathline's website, e-newsletter, or any other Healthline feature. *Id.* ¶ 69.  They seek $2,500 in statutory damages "per violation" for a period stretching back to 2013, notwithstanding that the statute of limitations under the VPPA is only two years. *Id.* ¶ 70; 18 U.S.C § 2710(c)(3).

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The rule that a court accept as true allegations in a complaint is "inapplicable to legal conclusions," *id.*, and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Warren v. Fox Fam. Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003) (citation omitted) ("We do not ... necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations."). Nor should a court "accept as true conclusory allegations which are contradicted by documents referred to in the complaint. *Id.* Dismissal is warranted where the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## IV.    ARGUMENT

### A.    The FAC Does Not Allege a Viable Claim Under the VPPA

#### 1.    Plaintiffs are not VPPA Consumers.

The Court held that former-plaintiff Robin Jefferson's complaint did not state a VPPA claim because her alleged subscription to a healthline.com email list did not plausibly show that she was a VPPA subscriber. Dkt. 38 at 5-6. For the FAC, Plaintiffs Heather and Nelson allege that they subscribed to e-newsletters or, in the case of Nelson, to the Bezzy website. But neither Plaintiff alleges that she subscribed to any audio-visual good or service provided on the Healthline

5

1   website. Thus, neither plausibly alleges that she is a VPPA subscriber.

2       By its terms, the VPPA applies to any "renter, purchaser, or subscriber of goods or services

3   from . . . any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video

4   cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(1), (4). Context here is

5   important. As the Court held, the terms "renter, purchaser, or subscriber" does not mean

6   "everything that might be labeled a 'subscription' automatically triggers the statute's protections."

7   Dkt. 38 at 5. Indeed, while statutory interpretation "begins and ends with the text," *id.* at 4

8   (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014)), the

9   Court must "give faithful meaning to the language Congress adopted in the light of the evident

10  legislative purpose in enacting the law in question," *id.* (quoting *Graham Cnty. Soil & Water*

11  *Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 298 (2010).) Accordingly,

12  "[w]hen interpreting the language of a statute we do not look at individual subsections in

13  isolation;" rather, "we must read the words in their context and with a view to their place in the

14  overall statutory scheme." *Tovar v. Sessions*, 882 F.3d 895, 901 (9th Cir. 2018) (quoting *King v.*

15  *Burwell*, 576 U.S. 473, 486 (2015)).

16      Here, Plaintiffs ask the Court to read the VPPA's text decidedly out of context. A central

17  interpretive question presented by their case is whether *any* subscription (or purchase or rental)

18  connected with an alleged "video tape service provider" (a "VTSP") qualifies an individual as a

19  VPPA consumer. The text, purpose, and history of the statute all confirm that the answer is no.

20      Multiple courts have held that the plain language of the VPPA conveys that "the definition

21  of 'consumer' [applies only] to a renter, purchaser or subscriber of audio-visual goods or services,

22  and not goods or services writ large." *Carter v. Scripps Networks, LLC*, No. 22-CV-2031 (PKC),

23  2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023); *see also Gardener v. MeTV*, No. 22-cv-05963,

24  2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) (agreeing that *Carter*'s and related cases'

25  "interpretation [of the VPPA] is in line with the clear meaning of 'subscriber' drawn from

26  dictionaries"). The VPPA provides parallel definitions for who is regulated ("VTSPs") and who is

27  protected ("consumers"): VTSPs rent, sell, or deliver audio-visual materials, and consumers rent,

28  purchase, or subscribe to those same goods or services. As *Carter* explains, the definition of

United States District Court
Northern District of California

6

1  "consumer" is thus tied to the definition of a VTSP. 2023 WL 3061858, at *6. Accordingly,

2  Sections (b)(1) and (c) provide a right of action "by a renter, purchaser of subscriber of audio

3  visual materials, and not a broader category of consumers." *Id.*; *see also Gardener*, 2023 WL

4  4365901, at *4 (rejecting argument that "an account separate and apart from viewing video

5  content on MeTV's website is sufficient to render [the plaintiffs] 'subscribers' under the Act.").

6  This conclusion is also supported by the VPPA's purpose and legislative history, which confirms

7  that—consistent with the statute's text—Congress sought to "allows consumers to maintain

8  control over personal information divulged and generated *in exchange for receiving services from*

9  *video tape service providers*" S. Rep. No. 100-599 at *8 (emphasis added).

10      Nothing in the statute suggests that the definitional components of "consumer" should be

11  considered without referencing the surrounding text or purpose of the VPPA. Indeed, doing so

12  would produce absurd results. Consider two hypothetical users visiting Google's YouTube video

13  platform for the first time: one is experiencing her first interaction with Google but the other

14  purchased a Nest thermostat (a decidedly non-video Google product) a year earlier.[3] It would be

15  nonsensical—and *specifically contrary* to the intended and expressly-stated purpose of the

16  VPPA—to argue that Congress intended that the Nest-purchaser have rights with respect to the

17  privacy of her video-watching decisions, but the other user should not. S. Rep. No. 100-599 at

18  *11-12 ("[S]imply because a business is engaged in the sale or rental of video materials or services

19  does not mean that all of its products or services are within the scope of the bill. For example, a

20  department store that sells video tapes would be required to extend privacy protection to only

21  those transactions involving the purchase of video tapes and not other products."). With respect to

22  their relationship to the video content they watched or requested, both consumers' relationship

23  with Google is identical, as are their rights under the VPPA. *See Carter*, 2023 WL 3061858, at *5

24  ("Plaintiffs' interpretation, taken to its logical end, likely would entitle a visitor who purchases a

25  [physical product] using an hgtv.com affiliate link to video-streaming privacy protections not

26  extended to otherwise-similar site visitors.").

27

28  [3] *See* Nest Learning Thermostat purchase page, available at https://store.google.com/config/
nest_learning_thermostat_3rd_gen?hl=en-US (last visited July 10, 2023).

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

But this freewheeling interpretation is exactly what Plaintiffs argue for here. Neither Plaintiff alleges that she subscribed to any audio-visual goods or services from Healthline. They do not, for example, allege that the e-newsletters they received included embedded video content. *See Gardener*, 2023 WL 4365901, at *5 (distinguishing *Lebakken v. WebMD, LLC*, No. 1:22-CV-644-TWT, 2022 WL 16716151, at *3 (N.D. Ga. Nov. 4, 2022), where "plaintiffs provided email address[es] and date[s] of birth . . . and in return received periodic newsletters *with video content*") (emphasis added). Nor do they allege that logging into either Healthline's or Bezzy's websites provided them with exclusive (or any) access to video materials. To the contrary, the FAC does not allege that the Healthline website—i.e., where the at-issue video was hosted—even provided an option for either Plaintiff to login or register. And while the FAC alleges that Nelson could log into the Bezzy website, it does not allege that any video was hosted there.

Instead, even with the additional information about the newsletters included in the FAC, all these Plaintiffs alleged is that they clicked on a hyperlink that sent them to a Healthline webpage that contained video content. But as numerous courts have held, that puts Plaintiffs in the same position as any other internet user. *Carter*, 2023 WL 3061858, at *6 (plaintiffs were not VPPA consumers where they are "free to watch or not watch hgtv.com videos without any type of obligation, no different than any [other visitor] to the site."); *Gardener*, 2023 WL 4365901, at *4 ("Plaintiffs concede that there is no need to open a MeTV account to watch videos on the website. As such, they concede that there is no 'exchange' for their handing over of [PII]."). As the Eleventh Circuit observed in *Ellis*, these Plaintiffs do not allege "any commitment or establish any relationship that . . . allow[ed] [them] to have access to exclusive or restricted content." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015). They are "subscribers to newsletters, not subscribers to audio visual materials." *Carter*, 2023 WL 3061858, at *6; *see also Gardener*, 2023 WL 4365901, at *5 (although plaintiffs created profiles on the defendant's website, they were not subscribers to website's video content because "the video content . . . can be accessed by anyone"). Accordingly, they do "not qualify . . . as a VPPA subscriber." *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 671 (S.D.N.Y. 2015) (opining that the

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

1    receipt of a newsletter that is "distinct and set apart from [a defendant's] provision of videos"

2    would not qualify an individual as a VPPA subscriber").

3          Finally, while neither Plaintiff alleges any commitment to video content provided on

4    Healthline's website, *Nelson* alleges no commitment to Healthline at all. All she alleges is that

5    Bezzy—the website she *does* allege a relationship with—is an affiliate of and owned by

6    Healthline. But nothing in the VPPA's text, purpose, or history suggests that such a tenuous

7    relationship gives her rights with respect to Healthline's website. Nelson is no more a "subscriber"

8    of Healthline or Healthline's website than a Whole Foods shopper is a subscriber to Amazon's

9    Prime Video service (both are owned by Amazon.com, Inc.), or a visitor to Disneyland is a

10   subscriber of ESPN (both are owned by the Walt Disney Company).

11         The VPPA is a statute with limits. These Plaintiffs fall outside of them.

12                    **2.       Healthline is not a Video Tape Service Provider.**

13         Plaintiffs' claim also fails because the VPPA is about movies and similar materials viewed

14   in the privacy of one's home; it does not apply to a business just because its website includes

15   video. The VPPA limits disclosures by a VTSP, which is a person "engaged in the business . . . of

16   rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18

17   U.S.C. § 2710(a)(4). For the VPPA to apply, then, the materials at issue must be prerecorded

18   video cassette tapes or similar audio visual materials *and* the entity at issue must be engaged in the

19   business of delivering such video content. The FAC includes no allegations suggesting that either

20   requirement is satisfied here.

21                    ***a.       The VPPA only concerns audiovisual content "similar to"***
                    ***prerecorded video cassette tapes.***

22

23         Healthline is not a VTSP simply because there is "audio visual content" on its website. The

24   VPPA does not apply to *all* or *any* audiovisual content; rather, it only applies to content "similar

25   to" the "prerecorded video cassette tapes" that Judge Bork rented from his local video store. 18

26   U.S.C. § 2710(a)(4). "Similar" means "[n]early corresponding; resembling in many respects;

27   somewhat like; having a general likeness." *Similar*, Black's Law Dictionary (6th ed. 1990).[4]

28   ─────────────────
     [4] The "most relevant time for determining a statutory term's meaning" is the time when the law
     was enacted. *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994).

United States District Court
Northern District of California

At the time of the VPPA's enactment, there were a multitude of "audiovisual" materials available to consumers. Had Congress wanted the VPPA to apply to *any* video it could have done so. But by restricting the statute to cover entities that provide content "similar" to pre-recorded video tapes, it set a narrower scope. In *Stanko*, the court observed that where "Congress used the comparative term 'similar' to modify 'offenses,' rather than saying 'any other offenses' or simply 'other offenses'"; it indicated "an intent to limit the business practices clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses." *United States v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007). So too with the VPPA. Congress could have defined a VTSP as someone in the business of delivering prerecorded video cassette tapes or "any other audio-visual materials" or simply "other audio-visual materials." It also could have defined a VTSP as someone in the business of delivering "audio visual materials, including prerecorded video cassette tapes." It did not, because it did not intend the VPPA to apply to all audio-visual materials, only those like the videos rented by Judge Bork. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018) ("[W]here, as here, a more general term follows more specific terms in a list, the general term is usually understood to 'embrace only objects similar in nature to those objects enumerated by the preceding specific words.'") (citation omitted); *First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*, 437 U.S. 255, 262 (1978) ("When Congress required that federal savings and loan associations be placed in the same classification as 'similar' state institutions, it certainly did not assume that every local and mutual or cooperative thrift and home-financing institution is similar to a federal association."). Thus, to state a claim, a plaintiff must make *some* showing that the defendant's provision of video content comes within the VPPA's narrowed scope. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) ("We do not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage.")

The minimal allegations provided in the FAC do not clear this bar. The FAC alleges only that "Healthline provides prerecorded audiovisual content on its website;" thus, Plaintiffs do not allege any facts showing that video content on Healthline's website is "similar to" prerecorded video tapes. FAC ¶ 47. Instead, they parrot the statutory language. *Id.* ¶ 84. But these are just

1   conclusions and not sufficient to maintain a lawsuit. *Warren*, 328 F.3d at 1139. Dismissal is

2   warranted.

3                    **b.        *Healthline is not "engaged in the business" of delivering videos.***

4          Healthline is also not a VTSP because it is not "engaged in the business" of providing

5   video as required by the VPPA. "The statute does not cover every company that merely delivers

6   audio visual materials ancillary to its business. It is confined to those engaged specifically *in the*

7   *business of* providing audio visual materials." *Carroll v. General Mills, Inc.*, No. 2:23-cv-01746-

8   DSF-MRW, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) (emphasis in original). To

9   qualify, "the defendant's product must not only be substantially involved in the conveyance of

10  video content to consumers but also significantly tailored to serve that purpose." *In re Vizio, Inc.,*

11  *Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). It must be a "focus of the

12  defendant's work." *Id.* That a business is "peripherally or passively involved in video content

13  delivery do[es] not [bring it] within the statutory definition of a [VTSP]." *Id.* at 1221–22.

14         Here, the FAC makes no effort to show that any video content incidentally present on

15  Healthline's website transforms the company into the equivalent of an online video rental store.

16  The most the FAC alleges is that Healthline's (but not Bezzy's) website occasionally provides

17  videos that accompany health-related articles on the website. FAC ¶ 44. But it alleges nothing to

18  suggest that its users come to Healthline to rent, buy, or subscribe to videos. In short, its business

19  is not "significantly tailored" to providing video content. *See McMillan v. Amazon.com, Inc.*, 983

20  F.3d 194, 199 (5th Cir. 2020), *certified question answered*, 625 S.W.3d 101 (Tex. 2021) (citation

21  omitted) (construing "engaged in the business" and observing, "When the client walks out of the

22  salon, she has shorter hair, but she also has a head full of hair product. . . . Still, a hairdresser is in

23  the business of selling haircuts, not selling handfuls of mousse. One does not go to the hair salon

24  to acquire a dollop of moisturizing serum and a few spritzes of hairspray."). Indeed, Plaintiffs'

25  theory would mean that nearly every health-related service with a website that includes video

26  content (e.g., the "What to expect on your visit" informational videos we've all watched) would

27  also be covered under the Act. But that impossibly broad scope is not supported by the VPPA's

28  reach. *See In re Nickelodeon*, 827 F.3d at 288 (the VPPA "serves different purposes, and protects

11

1   different constituencies, than other, broader privacy laws"); *see also Eichenberger v. ESPN, Inc.*,

2   876 F.3d 979, 985 (9th Cir. 2017) ("[W]e are not persuaded that the 1988 Congress intended for

3   the VPPA to cover circumstances so different from the ones that motivated its passage.").

4       Because Plaintiffs don't allege that Healthline provides materials "similar to" pre-recorded

5   video tapes or focuses its business on providing such content to consumers, the claim fails.

6           **3.   The Complaint does not plausibly allege that Healthline disclosed PII to Meta.**

7       The Plaintiffs' VPPA claim additionally fails because the FAC does not plausibly allege

8   that Healthline disclosed personally identifiable information ("PII") to Meta.

9       The VPPA limits only the disclosure of PII. As defined in the statute, PII "includes

10  information which identifies a person as having requested or obtained specific video materials or

11  services from a [VTSP]." 18 U.S.C. § 2710(a)(3). An actionable VPPA claim thus requires "three

12  distinct elements . . . the consumer's identity; the video material's identity; and the connection

13  between them." *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015)

14  (recognizing that "[t]he point of the VPPA, after all, is not so much to ban the disclosure of user or

15  video data; it is to ban the disclosure of information connecting a certain user to certain videos").

16      Plaintiffs' disclosure allegations rely on the supposed transmission of their Facebook

17  Profile IDs to Meta. But, as before, Plaintiffs do not plausibly allege that Healthline had any way

18  of knowing—much less disclosing—this information in the first instance. Indeed, while the

19  original plaintiffs alleged that they disclosed their "name and email address" when subscribing,

20  dkt. 1 ¶¶ 11, 20, these Plaintiffs concede that they *only* provided email addresses to Healthline,

21  FAC ¶¶ 12, 23; *see also* Landis Decl. Ex. A (e-newsletter sign up page only requiring submission

22  of email address), Landis Decl. Ex. B (Bezzy sign-up page only requiring submission of email

23  address). They do not allege that they created accounts on the Healthline website using their

24  Facebook credentials or were otherwise required to disclose their Facebook Profile IDs to access

25  videos on the site. Same with Bezzy: while Nelson alleges that she created a login for the website,

26  she does not allege that she informed Bezzy that she had a Facebook account or disclosed her

27  Facebook Profile ID at any point. Thus, the allegation that *Healthline* nevertheless could have

28

United States District Court
Northern District of California

12

1    disclosed information it was unaware of is conclusory, lacks support, and should not be credited.

2        Nor do Plaintiffs' allegations that Healthline "causes" the transmission of any user's

3    Facebook Profile ID (and video watching information) to Meta change matters. As previously

4    discussed, the transmission alleged here is a result of a *Facebook* cookie placed on Plaintiffs'

5    browsers, which only *Facebook*—and not any third party, including Healthline—can read. The

6    FAC still incorporates Healthline's Terms and Privacy Policy,[5] which explain that the site uses

7    unique codes that "Advertising platforms, such as . . . Facebook" can match against *their own* user

8    data, like Facebook Profile IDs. (Swinton Decl. Ex. B "How and When Do We Share Or Disclose

9    Your Information? Advertising."). For the Meta Pixel, Meta can do this matching because

10   *Facebook*—not Healthline—places a cookie containing a user's Facebook Profile ID on a

11   Facebook user's browser once a user uses her browser to log into Facebook.[6] This functionality is

12   why Plaintiffs allege that each visited the website "using the same browser that they use to login to

13   Facebook;" that activity makes it more likely (but does not guarantee) that Facebook's cookie and,

14   in turn, the Plaintiffs' Facebook Profile IDs, were present on the Plaintiffs' internet browsers when

15   they visited Healthline's website. FAC ¶ 4. With the cookie in place, when the Plaintiffs' visited

16   websites that included the Meta Pixel, *Facebook* was able to store and access cookies, including

17   the Facebook cookie on Plaintiffs devices.

18       Critically, the information stored within *Facebook*'s cookie (here, the Facebook Profile ID)

19   is not accessible to Healthline. It is only accessible to Facebook. "The only servers that can access

20   a particular cookie are those associated with the domain that wrote the cookie. That means that [a

21   website] can read only [its own] cookies, and it cannot read . . . facebook.com cookies." *In re*

22   *Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014)

23   (citation omitted). Thus, while *Facebook* can look for the presence of a *Facebook* cookie on a

24   visitor's browser and, if present, can read its cookie's contents, at no point third-parties like

25   ──────────────────────────

26   [5] The FAC still references and incorporates Healthline's Terms of Use and Healthline's Privacy Policy (which is expressly incorporated into that document), which are again attached to the Declaration of Stacy Swinton ("Swinton Decl.") as Exhibits A and B, respectively.

27   [6] This is all explained in Meta's Pixel and cookie documentation. *See* FAC ¶ 59; *see, e.g.,*
28   "Cookies & other storage technologies," https://www.facebook.com/privacy/policies/
     cookies/version/5567945786592090.

1    Healthline access its contents or disclose the included Facebook Profile ID to any other party. *See*

2    *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015)

3    (communications through browser internet cookies were between the user and the defendants).

4           The FAC anticipates this and suggests that Healthline is still liable because its placement

5    of the Meta Pixel on its website "causes" the at-issue disclosure, even if Healthline is not the party

6    making it. That allegation doesn't help. "Causing" a disclosure is not actionable: when Congress

7    wants to prohibit "causing" a disclosure—rather than making one directly—it says so explicitly.

8    *See, e.g.*, 15 U.S.C. § 6821 (prohibiting any person to "*cause to be disclosed . . .* customer

9    information of a financial institution" (emphasis added)); 10 U.S.C. § 949p-5 ("accused

10   reasonably expects to disclose, or *to cause the disclosure of*, classified information" (emphasis

11   added)). Congress used no such language here, as it was not concerned with unintentional, passive

12   disclosures when it passed the VPPA. Instead, it was concerned with the limited problem of

13   intentional revelations like the one that "motivated its passage"—a store clerk handing a list of

14   videos rented by Judge Bork to a reporter. *See In re Nickelodeon*, 827 F.3d at 284.

15          In sum, because Plaintiffs do not plausibly allege that Healthline could have disclosed her

16   Facebook Profile ID to Meta, the VPPA claim fails.

### 4. Even if it does allege a disclosure, the Complaint does not plead a "knowing" disclosure.

18          Finally, even if all deficiencies discussed above were ignored, the VPPA prohibits only

19   "knowing" disclosures of PII. 18 U.S.C. § 2710(b)(1). Here, Healthline's knowledge of its alleged

20   violations is not demonstrated by repeatedly inserting the words "knowingly" or "knew" into

21   individual paragraphs, as Plaintiffs do here. Rather, a plaintiff must "allege *facts* giving rise to a

22   reasonable inference that [Healthline] knowingly or willfully disclosed PII to someone other than

23   the consumer." *Mollett v. Netflix, Inc.*, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012)

24   (emphasis added), *aff'd*, 795 F.3d 1062 (9th Cir. 2015).

25          Plaintiffs' sole factual allegation on this front does not sufficiently allege Healthline's

26   knowledge. As *In re Hulu* explained, "the term 'knowingly' connotes actual knowledge. It is not

27   enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being

28

United States District Court
Northern District of California

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO DISMISS; CASE NO. 22-cv-05059-JD

1   'aware of what he or she is doing . . . and not act[ing] because of some mistake or accident." 86 F.

2   Supp. 3d at 1095. Rather, "'knowingly' means consciousness of transmitting the private

3   information. It does not merely mean transmitting the code." *Id.* Here, the Plaintiffs only allege

4   that Healthline installed the Pixel on its website, FAC ¶ 59, but they allege no details to suggest

5   Healthline understood the Pixel would cause analytical website data to be transmitted to Meta and

6   that the data would be "linked" to Plaintiffs' Facebook Profile IDs (which, as noted, Healthline

7   cannot even access). Nor do they allege that Healthline was even aware that either Plaintiff even

8   had a Facebook Profile ID.

9        The FAC comes nowhere close to alleging that Plaintiffs are VPPA consumers, Healthline

10   is a VTSP, or Healthline knowingly disclosed the Plaintiffs' Facebook Profile IDs to Meta. There

11   may be a situation where "use of a Meta Pixel may give rise to a privacy violation as contemplated

12   by the VPPA," dkt. 38 at 4, but that is not the scenario presented here.

13        **B.**     **The Complaint Does Not—And Cannot—Allege an Unjust Enrichment Claim.**

14        Plaintiffs' standalone claim for unjust enrichment fails as well. First, as the Court

15   previously held, the claim is still tethered to the Plaintiffs' VPPA claim. Because it fails, so does

16   the derivative claim for unjust enrichment. *Id.* at *3; *see also Hill v. Roll Int'l Corp.*, 195 Cal.

17   App. 4th 1295, 1307 (2011) ("There being no actionable wrong, there is no basis for the relief.")

18   And even if the VPPA claim did not fail, unjust enrichment is not a cause of action under

19   California law. *See Baxter Bailey & Assocs. v. Ready Pac Foods, Inc.*, No. CV 18-08246 AB

20   (GJSx), 2020 WL 1625257, at *6 (C.D. Cal. Feb. 26, 2020) (emphasis added) ("[T]he majority of

21   state and federal district courts in California do not recognize unjust enrichment as a freestanding

22   claim.").

23   **V.**     **CONCLUSION**

24        Plaintiffs seek to capitalize on the rash of VPPA causes now flooding federal courts, but

25   make little effort to show why they are entitled to any relief here. For that and all the reasons

26   discussed above, the FAC should be dismissed.

27

28

DEFENDANT HEALTHLINE INC.'S NOTICE OF MOTION AND MEMO IN SUPPORT OF MOTION TO
DISMISS; CASE NO. 22-cv-05059-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

DATED: July 10, 2023                    **ZWILLGEN PLLC**

By:  /s/ Jeffrey Landis
    Jeffrey Landis (*pro hac vice*)
    jeff@zwillgen.com

    **Attorney for Defendant**
    Healthline Media, Inc.

16